2005030655

*Doc+ 26*

# Court of Appeals, State of Michigan

## ORDER

People of MI v George Calicut Jr

Docket No.    254650

LC No.    99-003147

E. Thomas Fitzgerald
Presiding Judge

Michael J. Talbot

Patrick M. Meter
Judges

The Court orders that the motion to waive fees is GRANTED for this case only.

The Court orders that the motion to remand for *Ginther* hearing is DENIED.

The delayed application for leave to appeal is DENIED for failure to meet the burden of establishing entitlement to relief under MCR 6/508(D).

Presiding Judge

F I L E D

JAN 1 0 2006
CLERK'S OFFICE
DETROIT

Contains Poor Quality Pages



A true copy entered and certified by Sandra Schultz Mengel, Chief Clerk, on

*George Calicut v. Dan Quigley*
USDC #05-CV-72334-DT
HONORABLE VICTORIA A. ROBERTS

AUG 2 0 2004
Date

Chief Clerk



Mr. George Calicut Jr. 298836
Defendant in Propria Persona
Thumbs Correctional Facility
3225 John Conley Drive
Lapeer, Michigan 48446

Clerk of The Court
Michigan Court of Appeals
900 First Federal Building
Detroit, Michigan 48226

May 24, 2004

Re: <u>People</u> v. <u>George Calicut Jr</u>     BD·C
    Court of Appeals No. 254650
    Lower Court No. 99-3147

Dear Clerk:

    Enclosed for filing are one original and four (4) copies of:

    1. Notice of Hearing;

    2. Mot'on To Remand;

    3. Proof of service.

    If there are any questions or concerns, please feel free to write.

                                        Sincerely,

*Pleading mailed to old address. Envelope attached.*

STATE OF MICHIGAN

IN THE COURT OF APPEALS



RECEIVED
2004 JUN 17 AM 5:45
COURT OF APPEALS
DETROIT OFFICE
SANDRA SCHULTZ MENGEL
CHIEF CLERK

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

                          Michigan   Court   of   Appeals No. 254650

-vs-                           Lower Court No. 99-3147

GEORGE CALICUT JR.,,

            Defendant--Appellant

———————————————————————/

Mr. George Calicut Jr.
Inmate No. 298836
Defendant in Propria Persona

Wayne County Prosecutor
Attorney for Plaintiff
Appellate Division

———————————————————————/

## NOTICE OF HEARING

To: Wayne County Prosecutor
    Appellate Dividion
    Frank Murphy Hall of Justice
    1441 St. Antoine Street
    Detroit, Michigan 48446

    PLEASE TAKE NOTICE that the undersigne will move this Honorable Court to Grant  the within Motion To Remand at the Court's earliest opportunity  in connection with Defendant--Appellant's Application For Leave To Appeal.

                                  Respectfully Submitted,

Dated: *May 24, 2004*

                      BY: *George Calicut Jr.*
                    George   Calicut   Jr.   #   298836
                    Petitioner   in   Propria   Persona
                    Thumbs   Correctional   Facility
                    3225 John Conley Drive
                    Lapeer, Michigan 48446

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

                       Michigan   Court   of   Appeals   No. 254650

-vs-                    Lower Court No. 99-3147

GEORGE CALICUT JR.,

          Defendant-Appellant
_____/

Mr. George Calicut Jr.
Inmate No. 298836
Defendant in Propria Persona

Wayne County Prosecutor
Attorney for Plaintiff
Appellate Division
_____/

## MOTION TO REMAND FOR A <u>GINTHER</u> HEARING
## PURSUANT TO MCR 7.211(C)

    NOW COMES the Defendant-Appellant GEORGE CALICUT JR., in Propria Persona and respectfully moves this Honorable Court to grant this motion to remand and states as follows in support:

    1. This Court should exercise its discretion, and grant a motion to remand after making a determination that the requirements of MCR 7.211(C)(1) have been satisfied. <u>People</u> v. <u>Hernandez</u>, 443 Mich 1, 15, 21 (1993). That rule requires in pertinent part "that developement of a factual record is required for appellate consideration of the issue" identified in the motion. MCR 7.211(C)(1)(a)(ii); <u>People</u> v. <u>Hernandez</u>, <u>supra</u>, 443 Mich at 15-16.

    2. Defendant points out that the instant motion is not timely under MCR

-1-

211(C)(1), however, an untimely motion may still be granted notwithstanding the fact that tardiness can legitimately be considered by the Court as a factor in deciding whether or not to grant a remand motion, and that if the Court should elect to do so sub judice, then Defendant submits an affidavit explaining the basis for the delay. Cases that have addressed this aspect of timely remands was addressed in People v. Walker, 428 Mich 261, 266 (1987), abrogated in part on other grounds 454 Mich 145, 176 (1997), and People v. Moore, 129 Mich App 354, 358 (1983).

3. Here Defendant provides the Court with compelling reasons why the timeliness of his motion should be overlooked. Defendant is seeking a remand for purposes of a evidentiary hearing under People v. Ginther, 390 Mich 436 (1973), on his claim that his trial and appellate attorney was ineffective for having (a) failing to request that the trial court instruct that the killing and larceny were unrelated; (b) failing to bring to the trial court's attention that the conviction must be reduced to second degree murder where the subsequent alleged larceny occurred from a dead body; (c) failing to object when the prosecutor presented 404(b) evidence that was unfairly prejudicial; (d) failed to move for suppression of the consent to search, statements made at police headquarters where the police lacked probable cause for the defendants arrest, and appellate counsel's failure to raise the errors of trial counsel.

4. Defendant submits that although it is somewhat apparent from the existing record that if proven, defendant would be entitled to relief, it is only a prima facie showing that only encourages the proposition that defendant is entitled to appellate relief on these claims of error, and the Court should finess it's procedural rules in order to advance the interests of justice in this case. People v. LaPlaunt, 217 Mich App 733 (1996); People v. Hall, 102 Mich App 483, 494 (1980); People v. McCall, 403 Mich 858 (1978).

-2-

5. Trial counsel did not move for a new trial in the trial court alleging ineffective assistance of counsel and requesting a hearing under People v. Ginther, supra. To establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial. Strickland v. Washington, 466 US 668 (1984).

6. Defendant-Appellant submits that this request to remand pursuant to MCR 6.508(C); MCR 7.211(C), for developement of a factual record in support of his claims that trial and appellate counsel provided him with the ineffective assistance of counsel for the following reasons, among others:

Trial counsel provided ineffective assistance of counsel in reference to issue V (A) & (B), under Strickland v. Washington, 466 US 668 (1984) and People v. Pickens, 446 Mich 298 (1994) where he failed to request that the trial judge instruct that the killing and larceny were unrelated. People v. Bennie Thomas, 406 Mich 971 (1979); People v. Hunter, 209 Mich App 280 (1995). The prejudice by this failure is that counsel precluded defendant from being convicted of the lesser included offense of manslaughter which carries a 15 year maximum penalty as opposed to the present life sentence defendant is serving. Trial counsel also provided ineffective assistance for failing to bring to the Court's attention that defendant's conviction must be reduced to second degree murder where the subsequent larceny occurred from a dead body.

Trial counsel was ineffective under issue V, (C) in failing to object when defendant was denied his due process right to a fair trial where the prosecutor presented 404(B) evidence that was unfairly prejudicial in referencing to defendant's drug problem People v. Margaret Jones, 48 Mich App 334 (1973); People v. McKinney, 410 Mich 413 (1981), as the argument was not based upon evidence. Defendant was prejudiced because once the prosecutor sold to the jury that defendant was a crack cocaine addict, it followed that he murdered the victim.

Trial counsel was further ineffective in reference to Issue V, (D) in failing to move for suppression of the consent to search, statements at police headquarters where the police lacked probable cause for Defendant's warrantless arrest. See People v. Walker, 374 Mich 331, 338 (1965).

Defendant was denied the effective assistance of appellate counsel who failed to raise these crucial claims in Defendant-Appellant's initial appeal as of right. Evitts v. Lucey, 469 US 387 (1985) and to comply with Administrative Order 1981-7, Standard # 9.

Defendant submits that as a prerequisite to overcoming the procedural barriers of MCR 6.508(D) that a evidentiary hearing is very necessary so that a testimonial record can be made so that defendant can overcome the procedural bar and permit this court to reach the merits. People v. Reed, 449 Mich 375 (1995); MCR 6.508(D).

7. Defendant-Appellant hereby incorporates by reference his Application for leave to appeal on issues V and VI, and the adjoining facts as stated as part of the basis for the necessity of a hearing.

THEREFORE Defendant George Calicut respectfully requests that this Honorable Court issue an order remanding this matter to the trial court with instruction to hold an evidentiary hearing and whatever elese the court deems appropiate.

Respectfully Submitted,

Dated: May 24, 2004

BY: _George Calicut Jr._
George Calicut Jr. # 298836
Petitioner in Propria Persona
Thumbs Correctional Facility
3225 John Conley Drive
Lapeer, Michigan 48446

-4-

EXHIBIT-A

AFFIDAVIT OF GEORGE CALICUT JR

# AFFIDAVIT OF GEORGE CALICUT JR.

STATE OF MICHIGAN)
                 )ss
COUNTY OF LAPEER )

I, George Calicut JR., being first duly sworn, depose and says under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief:

1. That I am the Defendant-Appellant (hereinafter affiant) in this matter;

2. That submitted and filed my Application for leave To Appeal through the help of a fellow inmate name Deris Solomon, and that Mr. Solomon accumulated a hernia during the course of preparing my Application and motion as stated in the attached exhibit-A, to this motion;

3. That Mr. Solomon eventually completed the Motion To remand just prior to his going to surgery and provided it to affiant for submission;

4. Affiant is illeterate in terms of the law and hopes and prays that this court accepts the reason for delay.

FURTHER AFFIANT SAYETH NOT!

_Affiant-Defendant_

GWENDOLYN P. HOLMES
NOTARY PUBLIC GENESEE CO., MI
MY COMMISSION EXPIRES Jan 12, 2007

Subscribed and sworn to before me
This ___14___ day of May, 2004

Notary Public, County of Lapeer
State of Michigan
My commission Expires: 1/12/07

EXHIBIT-A

CORRESPONDENCE FROM DERIS SOLOMON

George Calicut,                                    5-21-04

As you may or may not have known I had to have surgery for a hernia which caused the delay. I was not able to do any bending and therefore I couldn't sit down. I had to complete your application under great pain so that it would be pending in Court. With that said, I'm sending you the Motion to Remand which I've finally completed, and you need to send this original and 4 copies to the Court Clerk, plus you will need to keep a copy and send a copy to the Wayne County Prosecutor so you'll need a total of 6 copies. Get your affidavit notarized, and proof of service.

Good luck.

Solomon !

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

Michigan   Court of   Appeals   No. 254650

Lower Court No. 99-3147

--vs--

GEORGE CALICUT JR.,

Defendant-Appellant
_____/

Mr. George Calicut Jr.
Inmate No. 298836
Defendant in Propria Persona

Wayne County Prosecutor
Attorney for Plaintiff
Appellate Division
_____/

PROOF OF SERVICE

STATE OF MICHIGAN)
                 )ss:
COUNTY OF LAPEER )

  I, GEORGE CALICUT JR., being first duly sworn, depose and says under the
penalty of perjury that on May _24_, 2004, I mailed one original and 4 copies
of the Motion To Remand to the Michigan Court of Appeals, Clerk of the Court
and one copy to the Wayne County Prosecutor by first class mail with postage
fully affixed.

                                    _George Calicut_
                                    Affiant-Defendant

Subscribed and sworn to before me
this _24_ day of May, 2004

_Kevin Roy Smith_
Notary Public, County of Lapeer
State of Michigan
My Commission Expires:

KEVIN ROY SMITH
NOTARY PUBLIC LAPEER CO., MI
MY COMMISSION EXPIRES Apr 17, 2005

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

Court of Appeals No.

Lower Court No. 99-3147

-vs-

GEORGE CALICUT, JR.,

Defendant-Appellant.

_____/

MR. GEORGE CALICUT JR.
Inmate # 298836
Defendant in Propria Persona

_____/

WAYNE COUNTY PROSECUTOR
Attorney for the Plaintiff-Appellee
Appellate Division

_____/

APPLICATION FOR LEAVE TO APPEAL, DENIAL
OF DEFENDANT-APPELLANT'S MOTION FOR RELIEF FROM JUDGMENT.

MR. GEORGE CALICUT JR.
Inmate # 298836
Defendant in Propria Persona
Thumbs Correctional Facility
3225 John Conley Drive
Lapeer, Michigan 48446

## TABLE OF CONTENTS

JUDGMENT APPEALED FROM AND RELIEF SOUGHT ..........................i--ii

INDEX OF AUTHORITIES ..............................................iii-viii

STATEMENT OF APPELLATE JURISDICTION ...............................ix

STANDARD OF REVIEW ................................................x

STATEMENT OF QUESTIONS PRESENTED ..................................xi-xii

STATEMENT OF FACTS ................................................1-24

ARGUMENTS:

    I.    THE COURT ERRED REVERSIBLY IN FAILING TO SUA SPONTE INSTRUCT THAT THE KILLING AND THE LARCENY WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THIS INSTRUCTION. ....................................................25

    II.   DEFENDANT'S CONVICTION MUST BE REDUCED TO SECOND DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED LARCENY OCCURRED FROM A DEAD BODY. ......................28

    III.  DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B) EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL. ...............30

    IV.   THE POLICE LACKED PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE OBTAINED THEREFROM WAS UNLAWFULLY ADMITTED AGAINST HIM. ......................................34

    V.   DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION IN THE FOLLOWING WAYS: .......................................40

        A.   Trial Counsel Was Ineffective In Failing To Request That The Trial Court Instruct That The Killing And Larceny Were Unrelated. ..........................40

        B.   Trial Counsel Was Ineffective For Failing To Bring To The Court's Attention That Defendant's Conviction Must Be Reduced To Second Degree Murder Where The Subsequent Alleged Larceny Occurred From A Dead Body. ...........................41

        C.   Trial Counsel Was Ineffective In

Failing To Object When Defendant
Was Denied His Due Process Right To
A Fair Trial Where The Prosecutor
Presented 404(B) Evidence That Was
Unfairly Prejudicial. ........................42

D. Trial Counsel Was Ineffective For
Failing To Move For The Suppression
Of    The    Consent    To   Search,
Statement's At Police Headquarters
Where The Police Lacked Probable
Cause    For    The    Defendant's
Warrantless Arrest. ........................43

VI.   DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
APPELLATE   COUNSEL   DURING   HIS CONSTITUTIONALLY
PROTECTED STATE APPEAL OF RIGHT IN VIOLATION OF
THE SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED
STATES CONSTITUTION. ..............................46

VII.  DEFENDANT HAS SHOWN "GOOD CAUSE" AND "ACTUAL
PREJUDICE" AND IS ENTITLED TO HAVE THIS COURT
REACH THE MERITS OF THESE CLAIMS. ...................49

REQUESTED RELIEF  ........................................49

## JUDGMENT APPEALED FROM AND RELIEF SOUGHT

The Defendant-Appellant George Calicut Jr., appeals from the January 16th, 2004, Opinion and Order of the Honorable Craig Strong of the Third Judicial Circuit Court, Criminal Division. That Opinion and Order is attached as Appendix-F, to this Application. The Opinion denys Defendant's Motion for Relief From Judgment.

Defendant respectfully requests that this Court grant leave to appeal in order to address the important constitutional issue that the trial court held were absent "cause" and "prejudice" under MCR 6.508(D), which clearly appears to fly in the face of language from the Michigan and United States Supreme Courts. Specifically, the trial court disposed of issues(1) and (2) by stating that the issue of defendant's arrest and search, and those that questioned the sufficiency of evidence were presented in Defendant's appeal of right. (Opinion at p. 3). Issue one addressed the trial court's failure to sua sponte instruct the jury that the killing and larceny were unrelated and had nothing to do with defendant's arrest and search, or the sufficiency of evidence, and in fact was never presented in the appeal of right. Issue two dealt with a sufficiency of evidence claim and although there was a sufficiency of evidence claim raised in the appeal by right, that claim dealt with a lack of evidence showing that defendant took the decedent's property, not as stated in the present claim which addresses the argument that the taking was from a dead person and thus was not considered a larceny. Also, while normally the law of the case doctrine applies without regard to the correctness of the prior determination, in criminal cases, a trial court retains the power to grant a new trial at any time where 'justice has not been done,' and since the defendant is actually innocent, the trial court should not be so inflexible and doom this defendant on an blatant error. (Opinion at p. 3).

i

Defendant also submits that counsel was ineffective and the trial court should have granted the requested evidentiary hearing so that defendant could develope his claim, however, Defendant was not permitted to have the hearing and show that these issues were asked of counsel to be raised on the appeal of right but ignored without any investigation. Trial court merely references Jones v. Barnes, 463 US 745; 103 S Ct 3308; 77 L Ed 2d 987 (1983), and states that counsel is not required to raise all possible claims of error. The Court never addressed where in Jones, the Court also stated in the concurrence of Justice Blackmun, whereby he stated: "that counsel's failure to raise a "requested" nonfrivolous issue on appeal constitutes "cause and prejudice" permitting later habeas consideration of that claim." Jones v. Barnes, supra, 103 S Ct at 3314. Therefore, refusing to address the claims based upon Jones, and then using that failure as a basis for imposing a procedural bar is erroneous.

Therefore, Defendant requests that this Court grant leave to appeal or, alternatively, reverse the decision of the trial court and remand this matter back for proper disposition or a new trial.

Respectfully Submitted,


Dated:

By: _____
   Mr. George Calicut Jr.
   Inmate # 298836
   Defendant in Pro-se
   Thumbs Correctional Fac
   3225 John Conley Drive
   Lapeer, Michigan 48446

## INDEX OF AUTHORITIES

### CASES

Banks v. Reynolds, 54 F.3d 1508 (10th Cir. 1995)........................59

Beasley v. United States, 491 F.2d 687 (CA 6, 1974)....................42

Beck v. Alabama, 447 US 625 (1980)..............................24, 28, 35

Brown v. Foltz, 763 F.2d 191 (CA 6, 1985)..............................51

Brown v. Illinois, 422 US 590 (1975)..........................36, 37, 47

Crisp v. Ducksworth, 743 F.2d 580 (CA 7, 1983)........................53

Daniel v. Thigpen, 742 F. Supp. 1535 (M.D. Ala. 1990).................57

Dunaway v. New York, 442 US 200 (1979)............................36, 47

Enoch v. Gramley, 70 F.3d 1490 (7th Cir. 1995)........................59

Evitts v. Lucey, 469 US 387 (1985)....................................51

Glasser v. United States, 315 US 60 (1942)...........................52

Gray v. Greer, 778 F.2d 350 (7th Cir. 1985)..........................51

Gray v. Greer, 800 F.2d 644 (7th Cir. 1986)..........................57

Grubbs v. Singletary, 900 F. Supp. 425 (M.D. Fla. 1995)..............58

Hays v. Florida, 470 US 811 (1985)...................................47

Henry v. United States, 361 US 98 (1959).............................35

House v. Balkcom, 725 F.2d 608 (CA 11, 1984).........................52

Jones v. Barnes, 103 S Ct 3308 (1983)................................51

Kuhlmann v. Wilson, 477 US 436 (1986)................................55

Lockhart v. Fratwell, 506 US 364 (1993)..............................39

McCoy v. Court of Appeals Wisconsin, 486 US 429 (1988)...............52

Michigan v. Summers, 452 US 692 (1981)...............................36

Mincey v. Arizona, 437 US 385 (1978).................................49

Miranda v. Arizona, 384 US 436 (1966)................................19

Mumford v. United States, 130 F.2d 411, cert den 317 US 656 (1942).....25

Murray v. Carrier, 477 US 478 (1986)................................55, 58

Neally v. Cabana, 764 F.2d 1173 (CA 5, 1985)........................52

Olsen v. McFaul, 843 F.2d 918 (6th Cir. 1988).......................60

People v. Beed, 198 Mich App 639 (1993).............................51

People v. Bennie Thomas, 406 Mich 971 (1979)....................26, 41

People v. Boyd, 416 Mich 538 (1982).................................47

People v. Caballero, 184 Mich App 636 (1990).......................41

People v. Carines, 460 Mich 750 (1999).............................55

People v. Casey, 411 Mich 179 (1981)...............................36

People v. Champion, 452 Mich 92 (1996).............................47

People v. Davenport, 99 Mich App 687 (1980)........................36

People v. deGraffenreid, 19 Mich App 702 (1969)....................42

People v. DerMartzex, ..............................................31

People v. Engleman, 434 Mich 204 (1990)............................30

People v. Ginther, 390 Mich 436 (1973).............................53

People v. Griffin, 44 Mich App 474 (1971)..........................35

People v. Hurst, 204 Mich App 634 (1994)...........................51

People v. Hutner, 209 Mich App 280 (1995)......................28, 41

People v. Irby, 129 Mich App 306 (1983).........................35-36

People v. James Robinson, 417 Mich 661 (1983)......................31

People v. Johnson, 451 Mich 115 (1996).............................40

People v. Johnson, 144 Mich App 125 (1985).........................51

People v. Jones, 48 Mich App 334 (1974)............................32

People v. Julian 171 Mich App 153 (1988)...........................41

People v. Kelly, 186 Mich App 524 (1987)...........................40

People v. Kelly, 231 Mich App 627 (1998)...........................47

People v. Landrum, 160 Mich App 159 (1985),
     vacated 430 Mich 861 (1988),
     reversed on remand 171 Mich App 148 (1988),
     reversed 434 Mich 482 (1990)........................................42

People v. Lewis, 160 Mich App 20 (1987)..............................36

People v. Margaret Jones, 48 Mich App 334 (1973)......................45

People v. Martin, 94 Mich App 649 (1980).............................36

People v. McKinney, 410 Mich 413 (1981)....................32, 45, 58

People v. McNamee, 67 Mich App 198 (1976)............................39

People v. Means, 97 Mich App 641 (1980)..............................45

People v. Morgan, 86 Mich App 226 (1978)....................32, 45

People v. Mosley (After Remand),
     400 Mich 181, cert den 434 US 861 (1977)........................36

People v. Neal, 182 Mich App 368.....................................49

People v. Oliver, 417 Mich 336 (1983)................................35

People v. Ora Jones, 395 Mich 379 (1975)....................24, 28

People v. Pauli, 138 Mich App 530 (1984)....................56, 58

People v. Pickens, 446 Mich 298 (1994)................39, 42, 52

People v. Randolph, 466 Mich 532 (2002)..............................25

People v. Reed, 393 Mich 342 (1975)........................24, 28

People v. Reed, 449 Mich 375 (1995)........................54, 58

People v. Rice, 61 AD2d 758; 402 NYS2d 191 (1978).....................25

People v. Richter, 54 Mich App 598 (1974)............................50

People v. Robinson, 99 Mich App 794 (1980)...........................39

People v. Robinson, 417 Mich 661 (1983)..............................30

People v. Russo, 439 Mich 584 (1992).................................47

People v. Sloan, 450 Mich 160 (1995).................................47

People v. Stapf, 155 Mich App 491 (1986).............................42

People v. Stewart, 232 Mich 670 (1925).................................35

People v. Summers, 407 Mich 432 (1979)...............................36

People v. Tommolino, 187 Mich App 14 (1991).....................39, 42

People v. Townes, 391 Mich 578 (1974).............................24, 28

People v. Trachida, 131 Mich App 446 (1984).........................53

People v. VanderVliet, 444 Mich 52 (1993)..........................30, 31

People v. VanDorsten, 441 Mich 540 (1993).........................25, 27

People v. Walker, 86 Mich App 155 (1978)...........................45

People v. Walker (On Rehearing), 374 Mich 331 (1965)...........38, 49

People v. Washington, 99 Mich App 330 (1980)......................47

People v. Ward, 226 Mich 45 (1924).................................35

People v. Watroba, 193 Mich App 124 (1992).........................55

People v. White, 38 Mich App 651 (1972).............................31

People v. Williams, 63 Mich App 389 (1975)..........................31

People v. Weatherspoon, 171 Mich App 549 (1988),
     436 Mich 1201 (1990)..........................................49

People v. Wolfe, 156 Mich App 225 (1986)............................51

Powell v. Alabama, 287 US 45 (1932).................................52

Quartararo v. Fogg, 679 F. Supp. 212 (ED NY,1988),
     Aff'd 849 F.2d 1467 (CA 2, 1988)..............................42

Robinson v. Norris, 60 F.3d 457 (8th Cir. 1995)....................58

Rummel v. Estelle, 498 F. Supp. 793 (W.D. Tex. 1980)...............58

Schlup v. Delo, 513 US 298 (1995)..................................55

Sims v. Livesay, 970 F.2d 1575 (CA 6, 1992)........................39

Smith v. Dahm, 779 F.2d 1045 (D. Neb. 1991)........................60

Strickland v. Washington, 466 US 668 (1984).............39, 40, 52, 53

Taylor v. Alabama, 457 US 687 (1982).....................36, 37, 38

United States v. Barbour, 813 F.2d 1232 (1987)..........................52

United States v. Bolden, 514 F.2d 1301 (CA DC, 1975)...................25

United States v. Cronic, 466 US 648 (1984)............................39

United States v. Frady, 546 US 152 (1982)............................54

United States v. Mack, 466 F.2d 333, cert den 409 US 952 (1972).......25

United States v. Olano, 507 US 725 (1993)............................55

United States v. Williamson, 53 F.3d 1500 (10th Cir.)
    cert denied Dryden v. United States 116 S Ct 218 (1995)...........39

United States v. Young, 470 US 1 (1985)........................24-25, 27

U.S. Ex Rel. Darnard v. Lane, 819 F.2d 798 (7th Cir. 1987).........57, 58

Vujosevic v. Rafferty, 844 F.2d 1023 (CA 3, 1988)..................24, 28

Wainwright v. Sykes, 433 US 72 (1977)...............................54

Wong Sun v. United States, 371 US 471 (1963)................35, 37, 38

Workman v. Tate, 957 F.2d 1339 (CA 6, 1992).........................39

## CONSTITUTIONS, STATUTES, COURT RULES

US Const V..........................................................24

US Const VI...................................................24, 33, 51

US Const X...........................................................29

US Const XIV..............................................24, 29, 33, 51

Mich Const 1963, Art 1, § 11.........................................33

Mich Const 1963, Art 1, § 17.....................................24, 29

Mich Const 1963, Art 1, § 20.....................................24, 51

MCL 764.15(d); MSA 28.374............................................35

MRE 404(b)...........................................................30

## MISCELLANEOUS

Criminal Jury Instructions 2nd Edition 23.1.........................27

22 Michigan Law and Practice, Trial, § 236, p. 386........        28

American Bar Association Standards 4-3.6................................40

Michigan Rules Professional Conduct 1.1 ................................40

## STATEMENT OF APPELLATE JURISDICTION

Jurisdiction is conferred upon this Court by MCR 6.509(A), which provides that appeals from decisions under subchapter 6.500 are by application for leave to the Court of Appeals under MCR 7.205(F)(3). Here, Defendant-Appellant's Motion for Relief From Judgment was denied January 16th, 2004.

## STANDARD OF REVIEW

Generally, the standard of review for the trial court's grant of a motion for post judgment relief is abuse of discretion. People v. Brown, 196 Mich App 153; 492 NW2d 33 (1992); People v. Bradshaw, 165 Mich App 562, 566-567; 419 NW2d 33 (1988); People v. Leonard, 224 Mich App 569, 578; 569 NW2d 663 (1997). However, the appellate court must view the trial court's exercise of discretion with the limitations on post judgment relief, i.e., "cause" and "prejudice," in mind. People v. Brown, supra, 196 Mich App at 157.

Abuse of discretion may be found when (1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based on an erroneous conclusion of the law; (3) the court's findings are clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision. Western Elec. Co v. Piezo Technology, Inc, 860 F.2d 428, 430 (Fed Cir. 1988). Badalmenti v. Dunhams, Inc, 896 F.2d 1359, (Fed Cir. 1990).

## STATEMENT OF QUESTIONS PRESENTED

I.   DID THE COURT ERR REVERSIBLY IN FAILING TO <u>SUA SPONTE</u> INSTRUCT THAT THE KILLING AND LARCENY WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THIS INSTRUCTION?

Defendant says "Yes"

Trial Court says " No"

II.   SHOULD DEFENDANT'S CONVICTION BE REDUCED TO SECOND DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED LARCENY OCCURRED FROM A DEAD BODY?.

Defendant says "Yes"

Trial Court says " No "

III.   WAS DEFENDANT DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B) EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL?

Defendant says "Yes"

Trial Court says " No "

IV.   DID THE POLICE LACK PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE OBTAINED THEREFROM UNLAWFULLY ADMITTED AGAINST HIM?

Defendant says "Yes"

Trial Court says " No "

V.   WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION IN THE FOLLOWING WAYS?:

Defendant says "Yes"

Trial Court says " No "

VI.   WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL DURING HIS CONSTITUTIONALLY PROTECTED STATE APPEAL OF RIGHT IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?

Defendant says "Yes"

"Trial Court says ". No "

VII.   HAS  DEFENDANT  SHOWN "GOOD CAUSE"  AND  "ACTUAL
PREJUDICE"  AND  IS  ENTITLED  TO  HAVE  THIS  COURT
REACH THE MERITS OF THESE CLAIMS?.

Defendant says "Yes"

Trial Court says " No "

## STATEMENT OF MATERIAL PROCEEDINGS AND FACTS

Defendant George Calicut, Jr. was charged with first degree felony murder pursuant to MCL 750.316; MSA 28.548, arising out of the killing of 63 year old Virgie Lee Perkins on Wednesday, March 10th, 1999, at her home on Hartford Street in Detroit, Michigan. Defendant was jury tried before the Honorable Craig S. Strong of the Third Judicial Circuit Court for Wayne County on October 4th, through October 8th, 1999[1]. On October 8th, 1999, Defendant was found guilty as charged. (T V, 20-24). He was sentenced to mandatory life in prison on October 27th, 1999. (ST, 13).

## Factual Background

### Theories of the Case

Defendant George Calicut Jr., who is 29 years old was convicted of killing a lifelong family friend, Virgie Lee Perkins. Defendant, who has no criminal history, no character for being a violent person, who was gainfully employed as a chef in Detroit, and renting a flat from his parents, was charged after Detroit Police learned he had a cellular telephone belonging to the victim, despite his explanation that he got it from her son, Lemuel Perkins, Jr. after she was killed.

Defendant purportedly gave a confession to Detroit Police Officer Barbara Simon, an officer characterized by colleagues as "good at getting statements." Defendant was taken to Detroit Homicide for what he thought would be simple questioning, although defendant was not free to leave. Officer Simon claimed that she Mirandized defendant, interviewed him, then she wrote out a statement when he immediately confessed. Simon explained to Defendant that he could sign the statement, be charged with manslaughter, obtain a bond and go home, or that he could refuse to sign, be charged with first degree murder, and imprisoned for the rest of his life. Defendant elected to sign the statement thinking he could go home and call an attorney. He was charged with first degree murder. Despite the

1

tement, defendant had consistently maintained that he did not kill Ms. Perkins, who had been like an aunt to him all his life. (ST, 11-12).

The prosecution theorized that Defendant was the person who killed Virgie Perkins because he had her cellular telephone 4 days after she was killed, he admitted he used crack cocaine, and because he signed the confession that Officer Simon wrote. Although noone saw him at or near the scene at the time of the killing, no physical evidence connected him to the crime, he had no motive to murder a longtime family friend for $5.00, the amount of violence displayed against the victim was inconsistent with his character, and he presented an alibi and an explanation for his possession of the cellular telephone, the jury convicted him.

### Testimony at Trial

Real Estate Appraiser Robert Presser and realtor Thomas Bonk went to the victim's home at 6757 Hartford in Detroit on March 10th, 1999 at about 3:00 or 3:15 in the afternoon. (T I, 100-102). Presser knocked on the door, but noone answered. The two men looked in the front living room window and saw a body lying on the floor. (T I, 103-104). A neighbor woman looked in the window and said the person lying there was the woman who lived in the home, Virgie Perkins. Presser called 911. (T I, 105).

The neighbor woman left and returned with her teenage daughter and two friends. (T I, 106-107). They went into the Perkins's house, returning within seconds. The young lady said that there was blood all over, so Presser called 911 again. (T I, 108).

19 year old Michael McCaskill lives 3 houses from the victim. On March 10, 1999, he was at home and saw two men outside Perkins's house. (T I, 112-114). After the men asked him if he knew Ms. Perkins, he went to the house with his brother Derrick, his sister Ladonna Adams, and her boyfriend Gregory McCaa (Phonetic). (T I, 115-116). He looked in the window and saw Ms. Perkins. Her

face was purple. Concerned about her safety, Michael pushed on the door, which seemed to be locked. However, when he did, it opened. He called to Ms. Perkins about 3 times. (T I, 117-118, 121-122).

Michael went into the home. Ms. Perkins was lying on her back on the living room floor. Towels were propped under her head, and her throat had been cut. He turned away and had his mother, Doretta Adams, call Ms. Perkins husband. (T I, 119-120). The police arrived and Michael spoke to them. (T I, 120-121). Michael McCaskill does not know the defendant, George Calicut, Jr.

Mr. James Perkins was married to Virgie Perkins for 44 years. Their two sons, Lemual Perkins, Jr. (Lemuel or "Junior") and William Scott Perkins, did not live at home full time, but they were in and out of the house. (T I, 125). Lemual, a truck driver, was on the road when his mother was killed, and the family had to call his dispatcher to reach him. (T I, 126, 132, 136). He had not been home for about 10 days, Mr. Perkins thought. (I I, 130; T II, 56-57).

The day his wife was killed, Mr. Perkins woke up and got ready for work. Mrs. Perkins was at home on disability. When he left she was watching television. (T I, 116-127). Mrs. Perkins did not have a car. (T I, 128).

Mr. Perkins has known George Calicut, Jr. and his family for about 25 years. Mr. Calicut had been to his house many times, and was someone Mrs. Perkins would have allowed in. (T I, 129). Mr. Calicut has always been respectful to Mr. and Mrs. Perkins. There was no reason they would not want him in their home. (T I, 149).

When Mr. Perkins got home at 4:00 or 4:10 p.m., police were there and people were standing around. They told him about his wife, but would not allow him to go inside the house. (I I, 131). He asked police to get his cellular phone from the house so he could call his daughters, but they were unable to find it. (T I, 146, 159). Later that day, he went into his house and saw that two phones were missing,

3

one a cordless phone, the other a cellular phone. (T I, 131-132, 145-146).

Mr. Perkins did not tell police about the missing cellular phone until March 13th, 1999, three days after the killing. (T I, 135, 147). The cordless phone was never recovered. (T I, 148). Other than the two phones, nothing was missing, and there was no sign of forced entry. (T I, 154). Many things were not taken, e.g., his guns, fishing equipment, stereo and television. (T I, 148-149).

The missing cellular phone was usually in the living room. Mr. Perkins thought he put it in the charger the Sunday evening before his wife was killed. (T I, 133-134, 147). He did not know what happened to it after he put it in the charger. He had been at work, so if anyone moved it, he did not know. (T I, 158). He identified a steak knife that he and his wife owned, and a sheath from a sportsman's knife that he owned. (T I, 141-142). Mr. Perkins did not know how much money his wife had when she was killed. (T I, 143-144). Sometimes she had money, because on the first of the month she got a check and paid bills. He was unsure if she had any money left over on the day she died. (T I, 153).

Mr. Perkins knew Cynthia Dennis from the neighborhood. (T I, 142). Before his wife's death, Ms. Dennis lived in his house for about 2 weeks because she needed a place to stay before she went into rehabilitation. (T I, 151, 157). About 4 or 5 days before she was killed, Mrs. Perkins asked Ms. Dennis to move out because she never went into rehabilitation. (T I, 151). Ms. Dennis did not seem bitter or mad after she moved out. Between the time his wife asked Ms. Dennis to leave and her death, Mr. Perkins saw Ms. Dennis practically every day. He had not seen her since his wife's funeral. (T I, 157). A few months before his wife died, Ms. Perkins accused her son Lemuel of stealing a check and a cellular phone from the house. He never recovered those items. (T I, 151, 155).

Investigator Barbara Simon of Detroit Homicide interviewed Defendant after his March 16th, arrest at the behest of Lt. Billy Jackson and Sergeant Cathy

ms. (T I, 161-162). He was in custody in an interview room. She entered the room and told him she wanted to discuss the stabbing of Ms. Perkins. Simon said Mr. Calicut was nervous and had been crying. (T I, 163-165; T II, 23). She read his <u>Miranda</u> rights. He initialed and signed the form at 9:15 p.m.. (T I, 165-166).

Simon claimed Defendant just told her what happened. (T I, 168). He was crying and worried about his mother's bad heart. (T II, 23, 37). Simon said she used a question and answer form. After they discussed what happened, they went over it again, she asked questions, he gave the answers and she wrote them down. Afterwards, defendant was allowed to make corrections. Then, he signed each page. Simon alleged that Defendant never said that he did not do the crime. (T I, 168; T II, 26, 35).

Simon never allowed Defendant to write a statement using his own handwriting, language or his own words. She wrote the entire statement. (T II, 35). Simon testified that Defendant told her he was high after smoking crack all night. He went to Ms. Perkins house about 10:00 a.m. to ask for money for crack. When Mrs. Perkins said she had no money, he "lost it", choking her until she passed out. After trying to wake her up, he cut her throat to make it look like someone broke in and killed her. He put the knife in the sink, went through her purse, took $5.00 and left. (T II, 6-7, 40). Simon testified under oath that Defendant said he took the cell phone because he wanted it to look like someone broke into the house. (T II, 7, 25). According to Simon, Defendant also said he gave the statement without threats or promises. He was sorry, crying and remorseful. (T II, 8, 40).

The statement said nothing about the towels that were placed under the victim's head. (T II, 41). The investigators knew about the knife in the sink, Simon said, although she was not told about it until after Defendant's statement. (T II, 42).

5

After the statement, Simon spoke to Sergeant Adams, and reported that
Defendant confessed and said that he put the knife in the sink. Adams told Simon
that only the killer would know that, because that detail had not been released to
the media. (T II, 9-10). Simon read "the file" before going into the interrogation
room. (T II, 19-20). She knew different interrogation techniques, but did not use
"good cop/bad cop". She recalled something from the file about the victims
daughter saying that she spoke to her mother at about 11:15 that morning. (T II,
18-22). However, Simon did not recall the time the daughter reported speaking to
her mother. Simon was not concerned that Defendant said he did the killing at
10:00 a.m. (T II, 34).

When pressed on cross-examination, Simon recalled defendant saying that he
got the cell phone out of a vehicle or truck. She had not written this down. She
did not recall if he said he got it from Junior (Lemuel) Perkins's truck. All she
wrote was that he said he took the cell phone. (T II, 27-29). Simon did not know
why she did not go over Defendant's explanation about the phone in more detail. (T
II, 29). She could not remember if defendant spoke about getting the phone from
the truck during the murder or not. Defendant said he got the $5.00 from the
purse, but did not say he took the cell phone as part of the robbery during the
murder. He always said he got the phone from a truck or car, and not from the
Perkins's house. (T II, 29-30). Simon explained that it was only her job to write
what defendant told her, not to ask where the cell phone was taken from. (T II,
33). However, Simon admitted that she has a reputation for being skilled at taking
and securing statements from suspects. (T II, 31).

Simon claimed that the other officers did not tell her about the missing cell
phone because they are in a different squad than she is. She maintained that she
was amazed that she got a file, interviewed the suspect, and he said he did the
crime. She got the file from Sergeant Adams and Lt. Jackson, no third officer was

there. Simon claimed that she was the only investigator to talk to defendant about the crime. (T II, 31-32).

Cynthia Scott, Ms. Perkins daughter, has known defendant for over 20 years. The day her mother was killed, she had called her from work between 10:30 and 11:15 a.m. to say she would be coming over to get some Motrin. (T II, 44). When she arrived at 12:00 or 12:30 p.m., there was no answer at the door. The curtains were drawn, so she called the house from her car phone, but still there was no answer. She also knocked on the window. (T II, 49). She tried the door but it was locked. After 10 minutes she left. She learned about her mothers death later that day. (T II, 50-51, 52, 56).

Ms. Scott knew that Ms. Dennis had stayed with her mother. They were cordial. Ms. Dennis red Le Baron was not in front of the house, so Ms. Scott thought that maybe Ms. Dennis took her mother to the store. (T II, 52). Ms. Scott knew that her mother recently told Ms. Dennis to move out, but she did not know why. (T II, 54). She did not think her mother "aggressively" put Ms. Dennis out, but she did not know how Ms. Dennis reacted. Ms. Scott said that they called her brother's dispatcher because he is a truck driver, and found him in Kansas City. (T II, 56-57).

Officer Georgia Peck of the 10th precinct testified that there was no forced entry into the house. (T II, 59-61). A makeshift pillow and towels were under the victim. The contents of Ms. Perkins's purse were poured on the floor. (T II, 62-63). The officers seized the purse and a red Chrysler Le Baron because of someone they were looking for, Ms. Dennis, who left the area. (T II, 65). Peck had spoken to the person, who said she had not been in the house that day. She had dropped off Joe Williams, Ms. Perkins's brother, while they were there. Neighbors told her that the person lived at the Perkins's house at one time. (T II, 66).

Evidence Technician Louis Francis and his partner Velma Tutt took photographs

and dusted for fingerprints. There were no prints on the outside door. (T II, 68-72). The purse was on the couch with the contents spread on the cocktail table, the phone was missing, the drapes were closed and the television was on. The victim was laid out neatly with a towel and a pillow folded underneath her head. (T II, 73-75). The kitchen sink contained a large bowl, a pan with reddish-tinted water, and there was blood on the handle of the kitchen knife that was found there. An empty knife sheath was found upstairs on a chair. (T II, 78-79). Francis lifted a print from the north window. (T II, 82).

Robyn Wright, a forensic technician with Detroit Police, tested the items for prints. There were fingerprints on the knife that were not usable, none on the leather sheath and none on the purse. (T II, 93-96, 97-98).

Tenth Precinct Officer Kevin Swope was called on March 16th, at around 7:30 in the evening to assist Lt. Jackson and Sergeant Adams with a consent search at Mr. Calicut's upper flat at 5135 South Martindale. (T II, 99-103). Swope was directed by Homicide Investigators, who were looking for a cellular phone. They told him it would be located beneath a mattress. He lifted a mattress in the front bedroom and found the phone. (T II, 102, 105-106).

Charles Rand, a neighbor, saw a gentleman who does "numbers" in the neighborhood knocking on Ms. Perkin's door at 11:30 a.m.. Usually Ms. Perkins allowed the numbers man into her house, but that day he left after knocking, because no one answered the door. (T II, 108-113). Rand did not see Ms. Dennis at the house at 10:00 a.m., when he first went out, or at 11:30 a.m., when he returned. (T II, 115).

Cynthia Lowe, M.D., a pathologist at the Wayne County Coroner's Office autopsied Ms. Perkins. She found a 1-inch cut across her neck, a bruise on her cheek, and superficial cuts on her right jaw and left of her neck. Ms. Perkins had also been strangled. (T II, 120-124). The strangulation was done manually or with

a softer item. (T II, 127-128). Ms. Perkins may have died from either the cut or the strangulation alone. (T II, 130-131).

Ms. Perkins weighed 95 pounds, and was still alive when her neck was cut. (T II, 131-135). The superficial cuts could have been made by a utility knife. The bruising was consistent with Ms. Perkins trying to ward off the strangulation. (T II, 133). Mrs. Perkins had a blood alcohol level of .21 at the time of death, so she was intoxicated, and this may have made it easier to strangle her. However, she may have had tolerance to the alcohol given her cirrhosis of the liver. (T II, 137). Dr. Lowe agreed that a large person could more easily strangle a small person, but a short, heavy person could strangle a light person as well. (T II, 140).

Raymond Knott knows Mr. Calicut through family, and is related to him through marriage. (T II, 142). He was at home sleeping at about 4:00 a.m. on the morning of March 15th, when he was awakened by a call from Mr. Calicut. (T II, 144). Two days later, on March 15th, 3 homicide detectives came to ask questions. (T II, 145-147). He gave them a statement that day at 4:35 p.m. (T II, 148-148).

Knott told police he last saw Defendant the Saturday before the funeral. He also saw him on the Monday before Ms. Perkins died, March 8th. Defendant was with Junior (Lemuel) Perkins. Knott was not mistaken about this. Junior was driving a big truck and Defendant was with him. (T II, 151-153). The police did not write down that he saw Defendant with Junior Perkins on Monday, so it was not in his statement. (T II, 158-159). He told police about how Defendant called him at 4 in the morning, and told them Defendant lived on Martindale. He did not hide anything for defendant and said he would not lie for him either. Police did not ask when he last saw Junior Perkins. (T II, 164-165).

Officer Ronald Visbara investigated the murder with Sergeant Cathy Adams. They followed up on the stolen cellular telephone and came up with Raymond

9

Knott. They talked with Knott on March 15th, at 4:35 p.m., and obtained Defendant's name. (T II, 165-169). Defendant's mother told police that Defendant was at work. (T II, 169).

Visbara, Lieutenant Jackson and Sergeant Adams arrested Defendant at Sweet Water Tavern, and took him to Detroit Homicide. He had nothing on his person. They wanted the cell phone he used to call Mr. Knott. Defendant signed a consent to search form so police could take the phone from his house at 7:05 p.m. (T II, 170-171). Visbara claimed he never talked to defendant. The officers asked Barbara Simon to talk to him. (T II, 174-176).

Visbara made no written reports regarding his activities in the investigation. When the officers talked to Defendant at the restaurant, they did not tell him they were looking for the phone. (T II, 178-180). They waited until they got to Homicide to ask about it. Defendant said he had it, and signed the consent form. If officers knew the exact location, Sergeant Adams or Lieutenant Jackson would have told them, because Visbara had not done it. The consent form listed the cell phone only. (T II, 181-182).

Visbara talked to Ms. Perkins neighbors, and looked for Ms. Dennis. The police spoke to her again on March 12th, 1999, at 11:00 a.m. (T II, 184).

Lieutenant Billy Jackson also worked on the Perkins case. (T III, 22-23). After Sergeant Adams spoke to Knott, Jackson and Visbara went to Martindale street to interview defendant, who was not there, so they went to Sweet Water Tavern. (T III, 9-11). After Visbara got the consent to search from Defendant for the cell phone, he and Adams went to Defendant's house, and found the phone in an upstairs room between the mattresses. Jackson verified that it was Ms. Perkins's phone. (T III, 12-13, 15-16). They also recovered a shotgun. They asked Simon to speak to Defendant so they could go home. (T III, 18-19).

Jackson did not make investigative notes. He became involved in the case when

Knott came in. (T III, 22-23). Defendant was not drugged or "crazed" at work. The police did not mention the cell phone at Sweet Water Tavern, they only told him they were there about Ms. Perkins's murder. He was taken to Homicide before anyone mentioned the cell phone. Then Visbara came with the consent form. (T III, 24-25).

Jackson claimed that Defendant did not tell the officers that the phone would be under the mattress. Adams did not say the phone would be there either. Jackson said he, not Officer Swope, physically lifted the mattress. Jackson said he did not tell Swope where the phone was because Defendant had not told him where it was. (T III, 26-28).

Jackson admitted that Barbara Simon was "renowned" for getting statements from suspects in Homicide. (T III, 29-30). Jackson described the "interview" room as 7 by 7 feet, with no windows, bare walls, a table, 3 chairs, one ceiling light, and a bolt on the door. He denied talking to Defendant. (T III, 30-31).

Jackson testified that he has seen people do things when they were on crack cocaine that they might not normally do. (T III, 33).

Sergeant Cathy Adams, the officer in charge, said Visbara took Ms. Dennis's statement because she lived in the Perkins's home, and was a suspect in the murder. Adams later checked Dennis's clothing for blood on March 12th, 2 days after the killing, because Ms. Dennis said she was wearing the same red blouse or shirt that she had on the day of the killing, and found nothing. (T III, 39-42, 65). Adams believed the clothes were the same because that was what Ms. Dennis told her, she did not recall if the neighbors confirmed this. (T III, 68). Nothing was found in Ms. Dennis's car. They followed up on what Ms. Dennis said, and ruled her out as a suspect. (T III, 42).

After obtaining the cell phone number from Mr. Perkins, Adams contacted the phone company, and found one phone call to a residence. She interviewed Raymond Knott on March 16th, and Knott told her defendant called him at 4:00 a.m. (T III,

11

44-46, 50).

Adams then went with Visbara and Jackson to Defendant's residence, and spoke to Defendant's mother about Mrs. Perkins's death. The officers then picked up defendant at Sweet Water Tavern, and took him to police headquarters, where he was under arrest. At the Tavern, they told defendant the matter involved Mrs. Perkins, but never mentioned the cell phone. At headquarters, Visbara got the consent form from defendant. (T III, 49-50, 55-57).

After the search, the officers returned with the cell phone and a shotgun. They confirmed that the phone was Ms. Perkins's. (T III, 51). They asked Simon to interview defendant and gave her the file. Later, Simon called Adams and said defendant confessed and told her he put the knife in the sink. Because the knife was found there, Adams concluded defendant would only know this if he did the crime. (T III, 53).

All the other investigators knew about the knife in the sink before March 16th. Photographs were taken before March 16th that were in the file, but Adams claimed that they would not have been in Simon's file. (T III, 58-59).

The day of the killing Officer Fleming interviewed Ms. Dennis's grandmother, Virgil Ross, at 7:30 p.m. (T III, 62, 70-71). Ross said that Ms. Dennis came to her house that day at about 5:30 p.m. with some sandwiches, then went out the back door after a few minutes. (T III, 62, 66). She had not seen Ms. Dennis since. When police spoke to Ms. Dennis on March 12th, she told Visbara that on March 10th, she went with her grandmother to a utility company to pay a bill, to another place to pay rent, and to Secretary of State to renew her license plate tabs. Her grandmother had written the checks for her. Ms. Dennis explained that she was no longer living with Ms. Perkins because Ms. Perkins's son moved in and they needed the room. She said nothing about rehabilitation or being asked to leave. (T III, 62-63, 64, 66-68, 70-72).

12

Ms. Dennis's 86 year old grandmother said on March 10th, that she had only seen Ms. Dennis for about 2 or 3 minutes. (T III, 65). To check Ms. Dennis March 12th, story, police re-interviewed her grandmother. This time, the grandmother changed her original story and said that Ms. Dennis had been with her doing chores. (T III, 66-67, 70, 73-75). However, she did not name the chores in the same order that Ms. Dennis did. (T III, 73-75). Adams said that this raised a lot of question marks, but the police did not inquire. For example, the grandmother paid rent, but did not know where Ms. Dennis lived. The officers did not go to the bank to see what checks the grandmother wrote that day, to the landlord to see if she paid her rent, or to the utility company to see if she paid a bill. Adams thought they ran her on LIEN and she did not renew her tabs that day, but she did not know if the LIEN was in file. She said she could provide it. (T III, 66-68, 73-75).

Adams said it was possible that Ms. Dennis told her grandmother what to say 2 days after the killing, because the grandmother had been questioned March 10th and she never reported running errands with Ms. Dennis. (T III, 76-78).

Adams found no blood in Ms. Dennis's car or her person on March 12th, 2 days after the killing so police let her go. (T III, 73-75).

Officer Georgia Deck's police report showed that on March 10th police told Ms. Dennis not to leave town, but she left, contrary to their direction. For this reason they seized Ms. Dennis car. (T III, 76, 80). Deck did note blood on Ms. Dennis the day of the killing, but did not say that she checked for it either. (T III, 79, 80).

Finally Adams told the jury that nothing was discovered from the print that was lifted from the window. (T III, 76-78). The people rested. (T III, 81).

Phyllis Snell testified for the defense. She knew Ms. Dennis, but did not know defendant. (T III, 82-83). In March Ms. Dennis lived on Hartford

13

street. Snell knew of Perkins's death because she was at her sister, Duretta Adams's, house on Hartford the day it was discovered. Ms. Dennis was at the house at about 4:00 p.m.. She was wearing a black jacket, a pink flowered pajama top under the jacket, blue jeans and black boots, not a red blouse. Snell was sure about what Ms. Dennis was wearing. (T III, 84-86).

Snell saw a mark on Ms. Dennis's left boot that looked like blood that afternoon. She told police about it. Ms. Dennis said nothing about the blood on her boot. Ms. Dennis was walking back and forth through her house and looking out the door like everyone else. Then, she left on foot. Snell did not know where Ms. Dennis went but said her car was in front of the house. (T III, 85-86).

On cross-examination, Snell said she was a good friend of Dennis's and that she had recently seen her in the neighborhood. (T III, 87). The boot, she said, had a rust colored mark on it that she took for blood. It looked like dried blood, and was not the color of fresh blood. Snell said she now had a doubt about whether it was blood because police took Dennis into custody. (T III, 87-89). Ms. Dennis pulled up in the car that day, and then Joe Williams, Virgie Perkins' brother, walked up. Ms. Dennis drove around the block, then parked at the house and talked with everyone. (T III, 89-90).

Snell thought the police were there when Ms. Dennis dropped Williams off and parked, and the woman was already dead. (T III, 94-95, 97). Between Ms. Perkins and Dennis's grandmother, Snell thought that Ms. Dennis's grandmother would have more money. (T III, 98).

Ladonna Adams never met defendant. (T III, 101-102). She found Ms. Perkins lying on her floor. After she left the Perkins home, she saw Ms. Dennis. Ms. Dennis just popped in out of the blue. (T III, 103). Ms. Dennis asked what happened, left and came back in her car 10 minutes later with Joe Williams. She did not go up to the house. Ms. Dennis did not seem to care about

14

Ms. Perkins. (T III, 103-104, 108). Ms. Dennis saw police, and said she was dodging them because she had warrants out for her arrest. The police told her to stay there but she took off. (T III, 106-107).

Defendant's grandmother, Forestine Calicut, testified. When the police first came to her house, her son George Calicut Jr., was at work. The police wanted to ask questions about Ms. Perkins. (T III, 110-111). When the police first came asking about her son, she called him at work to say the police were there. (T III, 112-113; T IV, 28). She did not think that he was involved, but the police kept asking if she knew her son was at the Perkins home drinking with Junior Perkins the previous Tuesday. (T IV, 28).

Mrs. Calicut recalled that the day of the killing her son was home. (T III, 113-119; T IV, 16-20). She was going to make fettucine that day. At around 10:00 a.m. her son took chicken out of the freezer. (T III, 114-115). Her son went to the basement, got his work clothes, put them on and asked her where his socks were. Later, his friend Eric picked him up at about 10 minutes before 5 to go to work. (T III, 114-117; T IV, 21). Defendant had not left the house that day until he went to work. (T III, 117; T IV, at 21).

The Calicut's house is a two family flat. Anyone leaving has to go out the front or side door. (T IV, 7, 12). Mrs. Calicut lives on Martindale with her husband, and all of her children live in their upper flat. The children are all adults who go to work early. She has a heart condition for which she takes medication. (T IV, 8-9).

Mrs. Calicut said that her son could not have slipped out of the house without her knowing about it. (T III, 118-119). She hears people on the stairs, despite her heart condition, and the television noise. (T IV, 21). If her son went to Virgie Perkins's house on foot it would have taken him a half hour because he has pins in his hips and he limps. (T III, 119).

15

When police came and took her statement, they did not ask her whether her son was home the day of the killing or not, and did not tell her he was a suspect. (T III, 120). When the police first arrived, a female officer said she was looking for a cellular phone (T IV, 4-5). The 3 officers who came, a white woman, a taller black officer and an older white officer, asked her if she knew that her son was at Ms. Perkins's house drinking with Junior Perkins the previous Tuesday. (T IV, 24-25, 27).

Mrs. Calicut said her son had never been arrested, never been in a police station, and never committed any act of violence that she knew of. (T IV, 4-5). He was a saute chef who lived at home, and rented his flat from his parents. (T IV, 22-23). He was not a violent person. (T IV, 23).

Mrs. Calicut knew that her son used crack cocaine. She had never seen him on crack, so she did not know how he acted then. (T IV, 22-23). He did not live at home because of crack, all 4 of her children lived at home. The crack bothered her, as he spent alot of money on it. (T IV, 45).

She was upset and surprised that her son had a phone under his bed. Mrs. Calicut found out he had been arrested the day after police came. (T IV, 32-33). On March 17th, after she was told Defendant confessed to murder, she apologized to Wanda Moody, Ms. Perkins daughter, who is related to Ms. Calicut by marriage. (T IV, 48, 50, 51). It was later that she recalled her son was with her on the day of the murder. (T IV, 49, 54, 56).

When Lt. Jackson came to search, he said that her son told police where the phone was located. After searching her house very thoroughly, the police left after they found a gun and the phone. (T III, 112; T IV, 34-35). When Ms. Calicut found out that her son was charged with murder, she did not call the police to say that he was home the day Ms. Perkins was killed. She called the family lawyer instead. (T IV, 36-37).

Defendant testified in his own defense, and denied committing the crime or giving the statement that Simon claimed he gave. On March 10th, he was living at home. He knew Mrs. Perkins as the mother of Wanda, Cindy, Junior and Scottie. He was related to her through marriage, and he had known her all his life. He grew up with both of her sons and was closer to Scott than he was to Junior. (T IV, 57).

Defendant had been a cook at Sweet Water Tavern for 8 months. He worked everyday, had never been arrested or charged with any crime, and had never been interrogated by police before. (T IV, 58).

On March 16th, his mother called him at work and told him the police had come to their house. He told his mother that the police were at his work now. (T IV, 58-59). Sergeant Adams, Lt. Jackson and Sergeant Visbara came to the tavern. They said they wanted to talk to him about the cell phone. (T IV, 59-61). He told them he had a cell phone, did not know who it belonged to, but that he got it from Lemuel Perkins Jr's truck. Then they asked him to come with them and give a statement. They never said he was under arrest, so he went with them. (T IV, 62). Defendant believed he was going to talk to them about the cell phone. The police said they would bring him back to work. (T IV, 61-62).

At Headquarters, they first took defendant to a big conference room. (T IV, 62-63). Jackson asked defendant to sign the consent to search, not Visbara. (T IV, 62-64). Defendant signed the form, and then they put him in "the box", or the smaller interrogation room that had only a table and a couple of chairs. Visbara spoke to him in the box, asking him where the phone was from, whether he knew Lemuel Perkins, Jr. whether he did drugs, whether he and Lemuel Perkins Jr, did drugs together. (T IV, 64-65). No one read him his rights, and he was not charged with anything. (T IV, 64-65).

Visbara locked him in the box and left. Lieutenant Jackson then came in, told defendant about the phone, and then asked the same questions that Visbara asked

17

Lemuel Perkins Jr., and where he got the phone. (T IV, 66). When Jackson first came in he halted, put his weapon outside the door, and locked them back in. (T IV, 67).

Then, Jackson left the box and locked it. Adams came and asked the same questions about Lemuel Perkins Jr., about the deceased, whether he knew anyone who would want to kill her. Adams left, and Visbara came back for a second visit. He asked the same questions and tried to see if Defendant was telling a lie. (T IV, 68-69). He left and Jackson came for his second visit, asked the same questions, then left and locked him in the box. After that, no one came for a while. (T IV, 69).

When Simon came, she did not read him his rights nor did she say he was charged with anything. (T IV, 70-71). Instead,  she gave him the rights paper, asked if he could read, and indicated that if he understood the rights he should check each one off. When he asked if he was being charged, she said he was not charged, and that this was just procedure. (T IV, 70-71).

After he initialed the rights, he gave the paper back to her, and she signed it. She asked the same questions the others asked. For example, she asked him if he did drugs, how much drugs he had done when Ms. Perkins was killed, what time he wakes up in the morning. (T IV, 71).

At  no  time  did  Defendant  say  that  he  killed  Ms. Perkins. (T  IV, 71). Defendant told the jury that Simon had lied to them. Even though it was true he had the phone under his mattress, he did not know where Lemuel Perkins Jr. got it. (T IV, 116). He admitted he had been dishonest when he took that phone from Lemuel, but said he was telling the  truth to the jury that he did not kill Mrs. Perkins. (T IV, 117-118).

Simon asked defendant if he knew what first degree murder was. He said no, and she said it was the most serious crime a person could be charged with. She

he would not get a bond if charged with it. He would spend the remainder of his life in prison until his death if charged with it. (T IV, 72). She then said if he would sign the statement she had, he could be charged with manslaughter, get a bond, and qualify for zero to 10 years in prison. She said, you don't want to go to jail, you have never been there, and defendant was saying no, he did not. Simon said it was in his best interest to sign, and he asked her why. She explained he should sign it if he did not want to go to jail, and if he did not sign, he would not get a bond and would have to stay there. Simon said she could write him a manslaughter statement. Defendant said okay, and she wrote the statement. (T IV, 72-73, 111-113).

Simon explained the situation to Defendant not as if it was a promise, but as though it was the law, so it would be inevitable. (T IV, 115). He wanted to get the bond to go home, and he expected to be found not guilty. (T IV, 113-114, 119-120). He was not willing to go to prison for the rest of his life for a crime he did not commit. (T IV, 114-115).

Defendant looked at the rights form and the statement, and told the jury that he signed it, but that it was not true he went to Mrs. Perkins's house on March 10th, to borrow money. He had been paid the day before March 10th. He did not say he smoked crack all night, or that he asked her for money and then "lost it." He did not tell Simon he choked Mrs. Perkins until she passed out, could not wake her, then cut her throat to make it look like a breaking and entering. (T IV, 71-73). Nor did he tell Simon he took $5.00 from Mrs. Perkins's purse, or that he smoked an eight ball and ½ of cocaine that evening. (T IV, 75).

Defendant told the jury he reasoned that the statement was written like a manslaughter, that he could go home, and then call his lawyer, so he signed it. (T IV, 76-77). Simon told defendant if he called an attorney from police headquarters, he would be charged with first degree murder because she would turn

case over to the investigating officers. She said that this was because he had the cell phone. (T IV, 77). Simon told defendant, he was not charged with anything, but that the other officers wanted to convict him of first degree murder. (T IV, 120). On the first page of the statement he had stopped writting his name because he was not sure about signing, then completed writting it after asking Simon again about what it meant. Simon said defendant needed to sign it. (T IV, 122). Defendant was in homicide, and he trusted Simon more than the other officers. (T IV, 123).

Defendant believed Simon when she said he might get 3 years for manslaughter, since he knew people who had gotten less time for worst conduct. (T IV, 103). Defendant said he truely thought if he signed every page he would be charged with manslaughter and become eligible for a bond, then he could explain to people why he signed the statement. (T IV, 110-111).

Defendant reiterated that he did not kill Mrs. Perkins, he was not in need of money and he had no reason to do that. He got the phone from Lemuel Perkins Jr, who was in town on Monday the 9th of March, and a number of people saw them together, including Mrs. Perkins. (T IV, 77-78, 81).

He stole the phone from Lemuel Perkins's truck the day after the murder, on Thursday, March 11th. (T IV, 81, 92, 96). Defendant said he stole the phone, even though he had his own money, and he could not make excuses for it. (T IV, 105-107). He waited at least 3 days before calling anyone on the phone, then he called Raymond Knott at 4:00 a.m., and knew he woke Raymond up. (T IV, 97). He was not high when he called Knott. Nor had he lost track of time. (T IV, 98, 104). Defendant admitted that he could have put the phone other places but he hid it under a mattress. (T IV, 100-101).

On cross-examination defendant testified that he had known Mrs. Perkins all his life, that she would let him in her house if he visited, and that she was like

aunt to him, someone he cared about deeply. At one time the Perkins family rented a flat from his parents. (T IV, 80-83). One of Mrs. Perkins's children, Wanda Moody, is married to Defendant's uncle. (T IV, 83).

Defendant explained that after he found out Mrs. Perkins had been killed, he did not speak with her husband. (T IV, 82). His parents told him that she was murdered, but he did not know that her throat was slashed. He thought the killing was awful, but he was not feeling guilty because he had not killed her. (T IV, 83-84). Any person who was like him would never had done a killing like that, because he is a peaceful person. (T IV, 85).

Defendant admitted that he smokes crack cocaine, but said that he is peaceful when he does it. (T IV, 86). He did not get off work on Wednesday, March 10th until about 3:15 a.m. He went to a crack house for a few minutes, smoked the crack at home in his upstairs flat, and went to bed. (T IV, 87-88). Defendant said his mother knew he used crack, and it bothered her, but he was not out of control with it, even though he spent alot of money on it. He did not smoke enough to hinder his work in any way, or to change his attitude towards people, and crack did not dictate his everyday life. (T IV, 90). He did not hang out at crack houses. (T IV, 103, 104).

Defendant did not go to Mrs. Perkins's funeral, even though she was as close as an aunt. He tried to explain that not going to the funeral did not make him guilty of her murder. (T IV, 98-100).

Defendant said he knew Mrs. Perkins would have allowed him in her house, but said that he would never ask her for money, had never asked her for money before, and if he wanted to borrow money, he could have done that at home. (T IV, 107-108). Defendant said that he was innocent. (T IV, 120).

The defense rested. (T IV, 123). Closing arguments followed by the prosecutor (T IV, 123-135), and then the defense (T IV, 135-165), and thereafter the

21

osecutor rebutted (T IV, 165-179). The jury was then instructed. (T V, 3-20), and after deliberating returned a verdict of guilty as to felony murder. (T V, 21). Defendant was subsequently sentenced on October 27th, 1999, to mandatory life in prison. (ST, 13).

Defendant filed a timely Claim of Appeal on January 25th, 2000, and the this Court pursuant to the indigent request for appointment of appellate counsel issued an order appointing  the State Appellate Defender Office as authorized by MCR 6.425(F)(3). The  State  Appellate  Defender  Office  assigned  Sarah  E. Hunter (P35961),  who  filed  a  brief  on  appeal  on  Michigan Court of Appeals Docket No. 224817, raising the following issues:

I.      THE   EVIDENCE   WAS   INSUFFICIENT   TO   SUPPORT
        MR. CALICUT'S CONVICTION FOR FIRST-DEGREE  FELONY
        MURDER IN VIOLATION OF MICHIGAN CONST 1963, ART 1
        § 17 AND US CONST, AMS V AND XIV.

II.     MR. CALICUT'S RIGHT TO DUE PROCESS,  HIS RIGHT
        AGAINST  SELF-INCRIMINATION  AND  HIS  RIGHT  TO
        COUNSEL VIOLATED WHERE POLICE FAILED TO MAKE AN
        AUDIO OR VIDEO RECORDING OF HIS STATEMENT.

III.    MR. CALICUT'S TRIAL COUNSEL WAS INEFFECTIVE UNDER
        US CONST, AMS VI, XIV AND MICH CONST 1963 ART 1,
        §§ 17, 20 WHERE HE FAILED TO MOVE FOR SUPPRESSION
        OF  MR. CALICUT'S  CONSENT  TO  SEARCH  AND  HIS
        STATEMENT AS BEING THE FRUITS OF AN ILLEGAL ARREST
        AND FAILED TO SEEK THEIR SUPPRESSION BECAUSE THEY
        WAS NOT VOLUNTARILY MADE.

        A.      Trial Counsel Was Ineffective For Failing
                To Move To Suppress Mr. Calicut's Consent
                To Search Or His Confession Where Both Were
                The Fruit Of An Illegal Arrest That Was Not
                Based On Probable Cause But Rather Was Made
                To Investigate Crime.

        B.      Trial  Counsel  Rendered  Ineffective
                Assistance  When He  Failed  To  Challenge
                The Admissibility Of The Confession On The
                Ground  That  It  Was  Involuntary  And
                Unreliable  Under  All  The Circumstances.

Appellate counsel  also  simultaneously filed  a Motion To Remand For A Evidentiary Hearing under People v. Ginther, 390 Mich 436 (1972), in connection

22

th his claim on ineffective assistance of counsel.

During the pendency of the appeal of right, appellate counsel was internally substituted from Sarah F. Hunter, to Jacqueline J. McCann.

On November 6th, 2000, the Michigan Court of Appeal issued it's Order Denying Defendant's Motion To Remand (See Appendix-A), and thereafter, on December 7th, 2001, the Michigan Court of Appeals issued their Per Curiam Opinion and Order affirming Defendant's conviction (See Appendix-B).

Defendant then raised the same issues raised in the Michigan Court of Appeals in the Michigan Supreme Court, through appellate counsel Jacqueline J. McCann, of the State Appellate Defender's Office by filing a Delayed Application for Leave To Appeal, which was assigned Case No. 120916, and on July 29th, 2002, the Michigan Supreme Court considered and denied leave to appeal (See Appendix-C).

Defendant then raised the following issues in a Motion For Relief From Judgment:

I.   THE COURT ERRED REVERSIBLY IN FAILING TO SUA SPONTE INSTRUCT THAT THE KILLING AND THE LARCENY WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THIS INSTRUCTION.

II.  DEFENDANT'S CONVICTION MUST BE REDUCED TO SECOND DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED LARCENY OCCURRED FROM A DEAD BODY.

III. DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B) EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL.

IV.  THE POLICE LACKED PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE OBTAINED THEREFROM WAS UNLAWFULLY ADMITTED AGAINST HIM.

V.   DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION IN THE FOLLOWING WAYS: