*DOC# 27*

# Order

May 31, 2005

126939

**Michigan Supreme Court**
**Lansing, Michigan**

Clifford W. Taylor
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Justices

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

GEORGE CALICUT, JR.,
Defendant-Appellant.

SC: 126939
COA: 254650
Wayne CC: 99-003147

_____/

On order of the Court, the application for leave to appeal the August 20, 2004 order of the Court of Appeals is considered, and it is DENIED, because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).

d0524

*Contains*
*Poor Quality*
*Pages*

F I L E D
JAN 1 0 2006
CLERK'S OFFICE
DETROIT

*George Calicut v. Dan Quigley*
USDC #05-CV-72334-DT
**HONORABLE VICTORIA A. ROBERTS**

I, CORBIN R. DAVIS, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

May 31 , 200 5

Clerk

STATE OF MICHIGAN

IN THE SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,
                    Plaintiff-Appellee

                                        Michigan Supreme Ct. No.

                                Michigan Court of Appeals No. 254650

-VS-

                                        Lower Court No. 99-3147

GEORGE CALICUT Jr.,
                                        *Wayne CRT*
                    Defendant-Appeallant.           *C. Strong*

_____/

Mr. GEORGE CALICUT Jr.
Inmate #298836
Defendant in Propria Persona
Muskegon Correctional Facility
2400 S. Sheridan Road
Muskegon, Michigan 49442

Wayne County Prosecutor
Attorney for Plaintiff
Appellate Division

_____/

**APPLICATION FOR LEAVE TO APPEAL DENIAL OF
DEFENDANT-APPELLANT'S MOTION TO REMAND**

*126939*

*10/5*

Mr. George Calicut Jr.
Inmate #298836
Defendant in Propria Persona
Muskegon Correctional Facility
2400 S. Sheridan Road
Muskegon, Michigan 49442

# FILED

SEP 1 2004

CORBIN R. DAVIS
CLERK
MICHIGAN SUPREME COURT

TABLE OF CONTENTS

JUDGMENT APPEALED FROM AND RELIEF SOUGHT ...........................i--ii

INDEX OF AUTHORITIES .............................................iii-viii

STATEMENT OF APPELLATE JURISDICTION ..................................ix

STANDARD OF REVIEW ...................................................x

STATEMENT OF QUESTIONS PRESENTED ..................................xi-xii

STATEMENT OF FACTS .................................................1-24

ARGUMENTS:

    I.    THE COURT ERRED REVERSIBLY IN FAILING TO SUA
        SPONTE INSTRUCT THAT THE KILLING AND THE LARCENY
        WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS
        INEFFECTIVE IN FAILING TO REQUEST THIS
        INSTRUCTION. .......................................25

    II.   DEFENDANT'S CONVICTION MUST BE REDUCED TO SECOND
        DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED
        LARCENY OCCURRED FROM A DEAD BODY. ..................28

    III.  DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A
        FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B)
        EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL. ............30

    IV.   THE POLICE LACKED PROBABLE CAUSE FOR DEFENDANT'S
        WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE
        OBTAINED THEREFROM WAS UNLAWFULLY ADMITTED
        AGAINST HIM. .......................................34

    V.    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
        TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT
        OF THE UNITED STATES CONSTITUTION IN THE
        FOLLOWING WAYS: ....................................40

        A.  Trial Counsel Was Ineffective In
            Failing To Request That The Trial
            Court Instruct That The Killing And
            Larceny Were Unrelated. .........................40

        B.  Trial Counsel Was Ineffective For
            Failing To Bring To The Court's
            Attention That Defendant's
            Conviction Must Be Reduced To
            Second Degree Murder Where The
            Subsequent Alleged Larceny Occurred
            From A Dead Body. ...............................41

        C.  Trial Counsel Was Ineffective In

Failing To Object When Defendant
Was Denied His Due Process Right To
A Fair Trial Where The Prosecutor
Presented 404(B) Evidence That Was
Unfairly Prejudicial. ..........................42

D. Trial Counsel Was Ineffective For
Failing To Move For The Suppression
Of The Consent To Search,
Statement's At Police Headquarters
Where The Police Lacked Probable
Cause For The Defendant's
Warrantless Arrest. ..........................43

VI. DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL DURING HIS CONSTITUTIONALLY
PROTECTED STATE APPEAL OF RIGHT IN VIOLATION OF
THE SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED
STATES CONSTITUTION. ..............................46

VII. DEFENDANT HAS SHOWN "GOOD CAUSE" AND "ACTUAL
PREJUDICE" AND IS ENTITLED TO HAVE THIS COURT
REACH THE MERITS OF THESE CLAIMS. ...................49

REQUESTED RELIEF ..........................................49

## JUDGMENT APPEALED FROM AND RELIEF SOUGHT

The Defendant-Appellant George Calicut Jr., appeals from the January 16th, 2004, Opinion and Order of the Honorable Craig Strong of the Third Judicial Circuit Court, Criminal Division. That Opinion and Order is attached as Appendix-F, to this Application. The Opinion denys Defendant's Motion for Relief From Judgment.

Defendant respectfully requests that this Court grant leave to appeal in order to address the important constitutional issue that the trial court held were absent "cause" and "prejudice" under MCR 6.508(D), which clearly appears to fly in the face of language from the Michigan and United States Supreme Courts. Specifically, the trial court disposed of issues (1) and (2) by stating that the issue of defendant's arrest and search, and those that questioned the sufficiency of evidence were presented in Defendant's appeal of right. (Opinion at p. 3). Issue one addressed the trial court's failure to sua sponte instruct the jury that the killing and larceny were unrelated and had nothing to do with defendant's arrest and search, or the sufficiency of evidence, and in fact was never presented in the appeal of right. Issue two dealt with a sufficiency of evidence claim and although there was a sufficiency of evidence claim raised in the appeal by right, that claim dealt with a lack of evidence showing that defendant took the decedent's property, not as stated in the present claim which addresses the argument that the taking was from a dead person and thus was not considered a larceny. Also, while normally the law of the case doctrine applies without regard to the correctness of the prior determination, in criminal cases, a trial court retains the power to grant a new trial at any time where 'justice has not been done,' and since the defendant is actually innocent, the trial court should not be so inflexible and doom this defendant on an blatant error. (Opinion at p. 3).

i

Defendant also submits that counsel was ineffective and the Trial Court should have granted the requested evidentiary hearing so that Defendant could develope his claim. However, Defendant was not permitted to have the hearing and show that these issues were asked of counsel to be raised on the Appeal of Right, but ignored without any investigation. Trial Court merely references Jones v. Parnes, 463 US 745; 103 S.Ct. 3308; 77 L.Ed.2d 987 (1983), and states that counsel is not required to raise all possible claims of error. The Court never addressed where is Jones, the Court also stated that in the concurrence of Justice Blackmun, whereby he stated" "that counsel's failure to raise a "requested" nonfrivolous issue on appeal constitutes "cause and prejudice" permitting later Habeas consideration of that claim." Jones v. Barnes, supra, 103 S.Ct at 3314. Therefore, refusing to address the claims based upon Jones, and then using that failure as a basis for imposing a procedural bar is erroneous.

Therefore, Defendant requests that this Court Grant Leave to Appeal or, alternatively, reverse the decision of the Trial Court and remand this matter back for proper disposition or a new trial.

Respectfully Submitted,

Dated: _____          By: _____
                                Mr. George Calicut Jr.
                                Inmate #298836
                                Defendant in Pro-se
                                Muskegon Correctional Facility
                                2400 S. Sheridan Road
                                Muskegon, Michigan 49442

ii

## INDEX OF AUTHORITIES

### CASES

Banks v. Reynolds, 54 F.3d 1508 (10th Cir. 1995)........................39

Beasley v. United States, 491 F.2d 687 (CA 6, 1974)....................41

Beck v. Alabama, 447 US 625 (1980)..............................24, 28, 36

Brown v. Foltz, 763 F.2d 191 (CA 6, 1985)..............................51

Brown v. Illinois, 422 US 590 (1975)..............................38, 37, 47

Criss v. Duckworth, 749 F.2d 580 (CA 7, 1983)..........................53

Daniel v. Thigpen, 742 F. Supp. 1535 (M.D. Ala. 1990)..................57

Dunaway v. New York, 442 US 200 (1979)............................36, 47

Enoch v. Gramley, 70 F.3d 1490 (7th Cir. 1995)........................59

Evitts v. Lucey, 469 US 387 (1985)....................................51

Glasser v. United States, 315 US 60 (1942)............................52

Gray v. Greer, 778 F.2d 350 (7th Cir. 1985)...........................51

Gray v. Greer, 800 F.2d 644 (7th Cir. 1986)...........................57

Grubbs v. Singletary, 900 F. Supp. 425 (M.D. Fla. 1995)...............56

Hays v. Florida, 470 US 811 (1985)....................................47

Henry v. United States, 361 US 98 (1959)..............................35

House v. Balkcom, 725 F.2d 608 (CA 11, 1984)..........................52

Jones v. Barnes, 103 S Ct 3308 (1983)................................51

Kuhlmann v. Wilson, 477 US 436 (1986).................................58

Lockhart v. Fretwell, 506 US 364 (1993)...............................39

McCoy v. Court of Appeals Wisconsin, 486 US 429 (1988)................58

Michigan v. Summers, 452 US 692 (1981)................................36

Mincey v. Arizona, 437 US 385 (1978)..................................49

Miranda v. Arizona, 384 US 436 (1966).................................49

Mumford v. United States, 130 F.2d 411, cert den 317 US 656 (1942).....25

Murray v. Carrier, 477 US 478 (1986);............................55, 58

Neally v. Cabana, 764 F.2d 1173 (CA 5, 1985)........................52

Olsen v. McFaul, 843 F.2d 918 (6th Cir. 1988)......................60

People v. Reed, 198 Mich App 639 (1993)............................51

People v. Bennie Thomas, 406 Mich 371 (1979)....................28, 41

People v. Boyd, 416 Mich 538 (1982)................................47

People v. Caballero, 184 Mich App 636 (1990)......................41

People v. Carines, 460 Mich 750 (1999).............................55

People v. Casey, 411 Mich 179 (1981)...............................36

People v. Champion, 452 Mich 92 (1996).............................47

People v. Davenport, 99 Mich App 687 (1980)........................36

People v. DeGraffenreid, 19 Mich App 702 (1969)....................42

People v. DerMartzex, .............................................31

People v. Engleman, 434 Mich 204 (1990)............................30

People v. Ginther, 390 Mich 436 (1973).............................58

People v. Griffin, 44 Mich App 474 (1971)..........................38

People v. Hurst, 204 Mich App 654 (1994)...........................51

People v. Hubner, 205 Mich App 280 (1995)......................28, 41

People v. Irby, 129 Mich App 306 (1983)..........................35-36

People v. James Robinson, 417 Mich 661 (1983)......................51

People v. Johnson, 451 Mich 115 (1996).............................40

People v. Johnson, 144 Mich App 125 (1985).........................51

People v. Jones, 48 Mich App 334 (1974)............................32

People v. Julian 171 Mich App 153 (1988)...........................41

People v. Kalin, 186 Mich App 624 (1987)...........................30

People v. Kelly, 231 Mich App 627 (1998)............................9

People v. Landrum, 160 Mich App 159 (1986),
    vacated 430 Mich 861 (1988),
    reversed on remand 171 Mich App 148 (1988),
    reversed 434 Mich 482 (1990)..............................42

People v. Lewis, 160 Mich App 20 (1987)......................36

People v. Margaret Jones, 48 Mich App 334 (1973)............45

People v. Martin, 94 Mich App 649 (1980)....................36

People v. McKinney, 410 Mich 413 (1981).............32, 45, 58

People v. McNamee, 67 Mich App 198 (1976)...................39

People v. Means, 97 Mich App 641 (1980).....................45

People v. Morgan, 86 Mich App 226 (1978)................32, 45

People v. Mosley (After Remand),
    400 Mich 181, cert den 434 US 861 (1977)................36

People v. Neal, 182 Mich App 368.............................49

People v. Oliver, 417 Mich 336 (1983).......................35

People v. Ora Jones, 395 Mich 379 (1975)...............24, 28

People v. Pauli, 138 Mich App 530 (1984)...............56, 58

People v. Pickens, 446 Mich 298 (1994).............32, 42, 51

People v. Randolph, 466 Mich 532 (2002).....................25

People v. Reed, 393 Mich 342 (1975)...................24, 28

People v. Reed, 449 Mich 375 (1995)...................54, 58

People v. Rice, 61 AD2d 758; 402 NYS2d 191 (1978)...........25

People v. Richter, 54 Mich App 598 (1974)...................50

People v. Robinson, 99 Mich App 794 (1980).................39

People v. Robinson, 417 Mich 661 (1983).....................30

People v. Russo, 439 Mich 584 (1992)........................47

People v. Sloan, 450 Mich 160 (1995)........................47

People v. Stapf, 155 Mich App 491 (1986)....................42

People v. Stewart, 232 Mich 670 (1925).....................................35

People v. Summers, 407 Mich 432 (1979)....................................33

People v. Tommolino, 187 Mich App 14 (1991)..........................39, 42

People v. Townes, 391 Mich 578 (1974).................................24, 28

People v. Trachida, 131 Mich App 446 (1984)...............................53

People v. VanderVliet, 444 Mich 52 (1993)...........................30, 31

People v. VanDorsten, 441 Mich 540 (1993)...........................25, 27

People v. Walker, 86 Mich App 155 (1978).................................45

People v. Walker (On Rehearing), 374 Mich 331 (1965)...............38, 49

People v. Washington, 99 Mich App 330 (1980)............................47

People v. Ward, 226 Mich 45 (1924).......................................35

People v. Watroba, 193 Mich App 124 (1992)..............................55

People v. White, 39 Mich App 651 (1972).................................31

People v. Williams, 53 Mich App 389 (1975)..............................31

People v. Weatherspoon, 171 Mich App 549 (1989),
     436 Mich 1201 (1990).................................................49

People v. Wolfe, 156 Mich App 225 (1986)................................51

Powell v. Alabama, 287 US 45 (1932).....................................52

Quartararo v. Fogg, 679 F. Supp. 212 (ED NY,1988),
     Aff'd 849 F.2d 1467 (CA 2, 1988)....................................42

Robinson v. Norris, 60 F.3d 457 (8th Cir. 1995).........................53

Rummel v. Estelle, 498 F. Supp. 793 (W.D. Tex. 1980)....................59

Schlup v. Delo, 513 US 298 (1995).......................................55

Sims v. Livesay, 970 F.2d 1575 (CA 6, 1992).............................39

Smith v. Daum, 779 F.2d 1045 (M. Neb. 1991).............................50

Strickland v. Washington, 466 US 668 (1984)...............34, 40, 52, 53

Taylor v. Alabama, 457 US 687 (1982)...................36, 37, 38

United States v. Barbour, 813 F.2d 1232 (1987)..........................52

United States v. Bolden, 514 F.2d 1301 (CA DC, 1975)...................25

United States v. Cronic, 466 US 648 (1984)............................39

United States v. Frady, 346 US 152 (1982)...............................34

United States v. Mack, 466 F.2d 333, cert den 409 US 952 (1972)........25

United States v. Olano, 507 US 725 (1993).............................55

United States v. Williamson, 53 F.3d 1500 (10th Cir.)
      cert denied Dryden v. United States 116 S Ct 215 (1995)...........39

United States v. Young, 470 US 1 (1985)...........................24-25, 27

U.S. Ex Rel. Barnard v. Lane, 819 F.2d 798 (7th Cir. 1987).........57, 58

Vujosevic v. Rafferty, 844 F.2d 1023 (CA 3, 1988)..................24, 28

Wainwright v. Sykes, 433 US 72 (1977)..................................34

Wong Sun v. United States, 371 US 471 (1963)..................35, 37, 38

Workman v. Tate, 957 F.2d 1339 (CA 6, 1992)...........................39

## CONSTITUTIONS, STATUTES, COURT RULES

US Const V..............................................................24

US Const VI....................................................24, 33, 71

US Const X.............................................................29

US Const XIV..............................................24, 29, 30, 51

Mich Const 1963, art 1, § 11............................................33

Mich Const 1963, art 1, § 17.......................................24, 29

Mich Const 1963, art 1, § 20.......................................24, 51

MCL 768.15(3); MSA 28.374.............................................30

MRE 404(b).............................................................50

## MISCELLANEOUS

Criminal Jury Instructions 2nd Edition 23.1...........................27

22 Michigan Law and Practice, Trial, § 236, p. 386........        28

American Bar Association Standards 4-3.6...............................40

Michigan Rules Professional Conduct 1.1 ...............................40

## STATEMENT OF APPELLATE JURISDICTION

Jurisdiction is conferred upon this Court by MCR 6.509(A), which provides that appeals from decisions under subchapter 6.500 are by application for leave to the Court of Appeals under MCR 7.205(F)(3). Here, Defendant-Appellant's Motion for Relief From Judgment was denied January 16th, 2004.

Jurisdiction is conferred upon this Court by MCR 7.302, which provides for appeals from decisions under MCR 7.205(F), by Application For Leave To Appeal to this Court.

## STANDARD OF REVIEW

Generally, the standard of review for the trial court's grant of a motion for post judgment relief is abuse of discretion. People v. Brown, 196 Mich App 153; 492 NW2d 33 (1992); People v. Pradshaw, 165 Mich App 562, 566-567; 419 NW2d 33 (1988); People v. Leonard, 224 Mich App 569, 578; 569 NW2d 663 (1997). However, the appellate court must view the trial court's exercise of discretion with the limitations on post judgment relief, i.e., "cause" and "prejudice," in mind. People v. Brown, supra, 196 Mich App at 157.

Abuse of discretion may be found when (1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based on an erroneous conclusion of the law; (3) the court's findings are clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision. Western Elec. Co v. Piezo Technology, Inc, 860 F.2d 428, 430 (Fed Cir. 1988). Badalmenti v. Dunhams, Inc, 896 F.2d 1359, (Fed Cir. 1990).

## STATEMENT OF QUESTIONS PRESENTED

I.   DID THE COURT ERR REVERSIBLY IN FAILING TO SUA SPONTE INSTRUCT THAT THE KILLING AND LARCENY WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THIS INSTRUCTION?

Defendant says "Yes"

Trial Court says " No"

II.   SHOULD DEFENDANT'S CONVICTION BE REDUCED TO SECOND DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED LARCENY OCCURRED FROM A DEAD BODY?.

Defendant says "Yes"

Trial Court says " No "

III.   WAS DEFENDANT DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B) EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL?

Defendant says "Yes"

Trial Court says " No "

IV.   DID THE POLICE LACK PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE OBTAINED THEREFROM UNLAWFULLY ADMITTED AGAINST HIM?

Defendant says "Yes"

Trial Court says " No "

V.   WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION IN THE FOLLOWING WAYS?:

Defendant says "Yes"

Trial Court says " No "

VI.   WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL DURING HIS CONSTITUTIONALLY PROTECTED STATE APPEAL OF RIGHT IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?

Defendant says "Yes"

"Trial Court says ".No "

VII.    HAS   DEFENDANT   SHOWN "GOOD CAUSE"   AND   "ACTUAL PREJUDICE"   AND   IS   ENTITLED TO HAVE THIS   COURT REACH THE MERITS OF THESE CLAIMS?.

Defendant says "Yes"

Trial Court says " No "

## STATEMENT OF MATERIAL PROCEEDINGS AND FACTS

Defendant George Calicut, Jr. was charged with first degree felony murder pursuant to MCL 750.316; MSA 28.548, arising out of the killing of 63 year old Virgie Lee Perkins on Wednesday, March 10th, 1999, at her home on Hartford Street in Detroit, Michigan. Defendant was jury tried before the Honorable Craig S. Strong of the Third Judicial Circuit Court for Wayne County on October 4th, through October 8th, 1999[1]. On October 8th, 1999, Defendant was found guilty as charged. (T V, 20-24). He was sentenced to mandatory life in prison on October 27th, 1999. (ST, 13).

### Factual Background

#### Theories of the Case

Defendant George Calicut Jr., who is 25 years old was convicted of killing a lifelong family friend, Virgie Lee Perkins. Defendant, who has no criminal history, no character for being a violent person, who was gainfully employed as a chef in Detroit, and renting a flat from his parents, was charged after Detroit Police learned he had a cellular telephone belonging to the victim, despite his explanation that he got it from her son, Lemuel Perkins, Jr. after she was killed.

Defendant purportedly gave a confession to Detroit Police Officer Barbara Simon, an officer characterized by colleagues as "good at getting statements." Defendant was taken to Detroit Homicide for what he thought would be simple questioning, although defendant was not free to leave. Officer Simon claimed that she mirandized defendant, interviewed him, then she wrote out a statement when he immediately confessed. Simon explained to Defendant that he could sign the statement, be charged with manslaughter, obtain a bond and go home, or that he could refuse to sign, be charged with first degree murder, and imprisoned for the rest of his life. Defendant elected to sign the statement thinking he could go home and call an attorney. He was charged with first degree murder. Despite the

i

statement, defendant had consistently maintained that he did not kill Ms. Perkins, who had been like an aunt to him all his life. (ST, 11-12).

The prosecution theorized that Defendant was the person who killed Virgie Perkins because he had her cellular telephone 4 days after she was killed, he admitted he used crack cocaine, and because he signed the confession that Officer Simon wrote. Although noone saw him at or near the scene at the time of the killing, no physical evidence connected him to the crime, he had no motive to murder a longtime family friend for $5.00, the amount of violence displayed against the victim was inconsistent with his character, and he presented an alibi and an explanation for his possession of the cellular telephone, the jury convicted him.

### Testimony at Trial

Real Estate Appraiser Robert Presser and realtor Thomas Bonk went to the victim's home at 6757 Hartford in Detroit on March 10th, 1999 at about 3:00 or 3:15 in the afternoon. (T 1, 100-102). Presser knocked on the door, but noone answered. The two men looked in the front living room window and saw a body lying on the floor. (T 1, 103-104). A neighbor woman looked in the window and said the person lying there was the woman who lived in the home, Virgie Perkins. Presser called 911. (T 1, 105).

The neighbor woman left and returned with her teenage daughter and two friends. (T 1, 105-107). They went into the Perkins's house, returning within seconds. The young lady said there was blood all over, and Presser called 911 again. (T 1, 108).

19 year old Joseph Neal, who with his family lived 3 houses from the victim on March 10, 1999, was at home and saw two men outside Perkins's house. (T 1, 111-114). After one had asked him if he knew Ms. Perkins, he went to the house with his brother Dedrick, his sister Cathina Adams, and her boyfriend Gregory Neal (Pinkard), (T 1, 115-116). He looked in the window and saw Ms. Perkins, and

face was purple. Concerned about her safety, Michael pushed on the door, which seemed to be locked. However, when he did, it opened. He called to Ms. Perkins about 3 times. (T I, 117-118, 121-122).

Michael went into the home. Ms. Perkins was lying on her bed on the living room floor. Towels were propped under her head, and her throat had been cut. He turned away, and had his brother, Porscha Adams, call Ms. Perkins husband. (T I, 119-120). The police arrived and Michael spoke to them. (T I, 120-121). Michael McCaskill does not know the defendant, George Christie, Jr.

Mr. James Perkins was married to Virgie Perkins for 30 years. Their two sons, Lemuel Perkins, Jr. (Lemuel or "Junior") and William Scott Perkins, did not live at home full time, but they were in and out of the house. (T I, 125). Lemuel, a truck driver, was on the road when his mother was killed, and the family had to call his dispatcher to reach him. (T I, 126, 152, 153). He had not been home for about 10 days, Mr. Perkins thought. (T I, 130; T II, 50-51).

The day his wife was killed, Mr. Perkins woke up and got ready for work. Mrs. Perkins was at home on disability. When he left she was watching television. (T I, 118-127). Mrs. Perkins did not have a car. (T I, 126).

Mr. Perkins has known George Chilcut, Jr. and his family for about 25 years. Mr. Chilcut had been to his house many times, and at sometime Mrs. Perkins would have allowed him. (T I, 128). Mr. Chilcut had always been respectful to Mr. and Mrs. Perkins. There was no reason they would not want him in their home. (T I, 135).

When Mr. Perkins got home at 4:00 or 4:30 p.m., police were there and people were scrambling around. They told him about his wife, but would not allow him to go inside the house. (T I, 131). He asked police to get his cellular phone from the house so he could call his daughters, but they were unable to find it. (T I, 146, 153). Later, she says, he said that his keys and cash and two phones were missing,

one a cordless phone, the other a cellular phone. (T I, 131-132, 143-145).

Mr. Perkins did not call police about the missing cellular phone until March 13th, 1999, three days after the killing. (T I, 135, 147). The cordless phone was never recovered. (T I, 145). Other than the two phones, nothing was missing, and there was no sign of forced entry. (T I, 154). Many things were not taken, e.g., his guns, fishing equipment, stereo and television. (T I, 147-149).

The missing cellular phone was usually in the living room. Mr. Perkins thought he put it in the charger the Sunday evening before his wife was killed. (T I, 133-134, 147). He did not know what happened to it after he put it in the charger. He had been at work, so if anyone moved it, he did not know. (T I, 153). He identified a steak knife that he and his wife owned, and a sheath from a sportsman's knife that he owned. (T I, 141-142). Mr. Perkins did not know how much money his wife had when she was killed. (T I, 143-144). Sometimes she had money, because on the first of the month she got a check and paid bills. He was unsure if she had any money left over on the day she died. (T I, 153).

Mr. Perkins knew Cynthia Dennis from the neighborhood. (T I, 143). Before his wife's death, Ms. Dennis lived in his house for about 1 week because she needed a place to stay before she went into rehabilitation. (T I, 151, 157). About 4 or 5 days before she was killed, Mrs. Perkins asked Ms. Dennis to move out because she never went into rehabilitation. (T I, 151). Ms. Dennis did not seem bitter or mad after she moved out. Around the time his wife asked Ms. Dennis to leave, and after death, Mr. Perkins saw Ms. Dennis practically every day. He also saw her sister, his wife's funeral. (T I, 157). A few months before his wife died, Ms. Perkins accused her son Damon of stealing a watch and a cellular phone from the house. He having recovered those items. (T I, 151, 153).

Investigator Sargeant Simon of Pontiac Homicide interviewed Defendant after his March 15th, arrest at the behest of the Billy Jackson and Sergeant Cindy

Adams. (T I, 161-162). He was in custody in an interview room. She entered the room and told him she wanted to discuss the stabbing of Ms. Perkins. Simon said Mr. Calicut was nervous and had been crying. (T I, 163-165; T II, 23). She read his Miranda rights. He initialed and signed the form at 9:15 p.m.. (T I, 165-166).

Simon claimed Defendant just told her what happened. (T I, 168). He was crying and worried about his mother's bad heart. (T II, 23, 37). Simon said she used a question and answer form. After they discussed what happened, they went over it again, she asked questions, he gave the answers and she wrote them down. Afterwards, Defendant was allowed to make corrections. Then, he signed each page. Simon alleged that Defendant never said that he did not do the crime. (T I, 166; T II, 26, 36).

Simon never allowed Defendant to write a statement using his own handwriting, language or his own words. She wrote the entire statement. (T II, 35). Simon testified that Defendant told her he was high after smoking crack all night. He went to the Perkins house about 10:00 a.m. to ask for money for crack. When Mrs. Perkins said she had no money, he "lost it", choking her until she passed out. After trying to make her up, he cut her throat to make it look like someone broke in and killed her. He put the knife in the sink, went through her purse, took $0.10 and left. (T II, 5-7, 26). Simon testified under oath that Defendant said he took the cell phone because he wanted it to look like someone broke into the house. (T II, 7, 26). According to Simon, Defendant also said he gave no statements without a lawyer or promises. He was scared, crying and remorseful. (T II, 8, 37).

The statement said nothing about the towels that were pushed into the victim's head. (T II, 41). The investigators knew about the knife in the sink, Simon said, although she was not told about it until after Defendant's statement. (T II, 41).

After the statement, Simon spoke to Sergeant Adams, and reported that Defendant confessed and said that he put the knife in the bush. Adams told Simon that only the killer would know that, because that detail had not been released to the media. (T II, 9-10). Simon read the file before going into the interrogation room. (T II, 19-20). She knew different interrogation techniques, but did not use "good cop/bad cop". She recalled something from the file about the victims daughter saying that she spoke to her mother at about 11:15 that morning. (T II, 18-22). However, Simon did not recall the time the daughter reported speaking to her mother. Simon was not concerned that Defendant said he did the killing at 10:00 a.m. (T II, 34).

When pressed on cross-examination, Simon recalled defendant saying that he got the cell phone out of a vehicle or truck. She had not written this down. She did not recall if he said he got it from Julius (Lemming) Perkins's truck. All she wrote was that he said he took the cell phone. (T II, 27-28). Simon did not know why she did not go over Defendant's explanation about the phone in more detail. (T II, 29). She could not remember if Defendant spoke about getting the phone from the truck during the murder or not. Defendant said he got the $5.00 from the purse, but did not say he took a cell phone as part of the robbery during the murder. He always said he got the phone from a truck or car, and not from the Perkins's house. (T II, 29-30). Simon explained that it was only her job to cite what defendant told her, not to ask where the cell phone was taken from. (T II, 48). However, Simon admitted that she had a reputation for being skilled in taking, and securing statements from suspects. (T II, 51).

Simon claimed that the other officers did not tell her about the missing cell phone because they are in a different squad than she is. She maintained that she did not know that she got a first interviewed the suspect, and he said he had the cell. She got the cell from Sergeant Adams and Det. Thomson, no other officer was

there. Simon claimed that she was the only investigator to talk to defendant about the crime. (T II, 51-52).

Cynthia Scott, Ms. Perkins daughter, has known defendant for over 20 years. The day her mother was killed, she had called her from work between 10:30 and 11:15 a.m. to say she would be coming over to get some Motrin. (T II, 49). When she arrived at 11:30 or 12:00 p.m., there was no answer at the door. The curtains were drawn, so she called the house from her car phone, but still there was no answer. She also knocked on the window. (T II, 45). She tried the door but it was locked. After 10 minutes she left. She learned about her mother's death later that day. (T II, 50-51, 52, 56).

Ms. Scott knew that Ms. Dennis had stayed with her mother. They were cordial. Ms. Dennis car to Tyson was not in front of the house, so Ms. Scott thought that maybe Ms. Dennis took her mother to the store. (T II, 52). Ms. Scott knew that her mother recently told Ms. Dennis to move out, but she did not know why. (T II, 54). She did not think her mother "aggressively" put Ms. Dennis out, but she did not know how Ms. Dennis reacted. Ms. Scott said that they called her brother's dispatcher because he is a truck driver, and found him in Kansas City. (T II, 56-57).

Officer Sergt. Beck, who took pictures published that that was no forced entry into the house. (T II, 59-61). A makeshift pillow and towels were under the victim. The contents of Ms. Perkins's purse were poured on the floor. (T II, 61-62). The officers seized the purse and a 16 Chrysler LeBaron because of something they saw belonging to Ms. Dennis, who left the scene. (T II, 65). Beck had gotten to the person, she said she had not been in the house that day. She had dropped off Joe Williams, Ms. Perkins's brother, while they were there. Neighbors told her that the person lived at the Perkins's house at the time. (T II, 66).

Evidence foundation Conrad Richards and his partner Peter Dobb took photographs

and dusted for fingerprints. There was no prints on the outside door. (T II, 63-72). The purse was on the couch with the contents spread on the cocktail table, the phone was missing, the drapes were closed and the television was on. The victim was laid out neatly with a towel and a pillow folded up beneath her head. (T II, 73-75). The kitchen sink contained a large bowl, a pan with reddish-tinted water, and there was blood on the handle of the kitchen knife that was found there. An empty knife sheath was found upstairs on a chair. (T II, 78-79). Francis lifted a print from the north window. (T II, 83).

Robyn Wright, a forensic technician with Detroit Police, tested the items for prints. There were fingerprints on the knife that were not usable, none on the leather sheath and none on the purse. (T II, 93-96, 97-99).

Tenth Precinct Officer Kevin Swops was called on March 18th, at around 7:30 in the evening to assist Lt. Jackson and Sergeant Adams with a consent search at Mr. Carlotta's upper flat at 6175 South Martindale. (T II, 99-101). Swops was directed by homicide investigators, who were looking for a cellular phone. They told him it would be located beneath a mattress. He lifted a mattress in the front bedroom and found the phone. (T II, 101, 105-106).

Charles Pand, a neighbor, saw a gentleman who was knocking in the neighborhood knocking on Mr. Perdin's door at 11:30 a.m. Oddly, Mr. Perding allowed the numbers man into her house, but that by he left she knocking, because no one answered the door. (T II, 109-110). Pand did not see Ms. Dennis at the house at 10:00 a.m., when he first went out, or at 11:30 a.m., when he returned. (T II, 115).

Cynthia Bird, M.D., a pathologist at the Wayne County Coroner's office autopsied Ms. Perkins. She found a 4-inch cut across her neck, a bruise on her cheek, and superficial cuts on her right jaw and left of her neck. Ms. Perkins had also been strangled. (T II, 120-124). The strangulation was done manually or with

a softer item. (T II, 127-128). Ms. Perkins may have died from either the cut or the strangulation alone. (T II, 130-131).

Ms. Perkins weighed 95 pounds, and was still alive when her neck was cut. (T II, 131-135). The superficial cuts could have been made by a utility knife. The bruising was consistent with Ms. Perkins trying to ward off the strangulation. (T II, 135). Mrs. Perkins had a blood alcohol level of .21 at the time of death, so she was intoxicated, and this may have made it easier to strangle her. However, she may have had tolerance to the alcohol given her cirrhosis of the liver. (T II, 137). Dr. D[...] agreed that a large person could more easily strangle a small person, but a short, heavy person could strangle a light person as well. (T II, 140).

Raymond R[...] knows the Defendant through family, and is related to him through marriage. (T II, 142). He was at home sleeping at about 4:00 a.m. in the morning of March 10th, when he was awakened by a call from his [...]. (T II, 144). Two days later, on March 12th, [...] homicide detectives came to ask questions. (T II, 144-145). He gave them a statement that day at 4:30 p.m. (T II, 145-146).

R[...] told police he last saw Defendant the Saturday before the funeral. He also saw him on the Monday before Ms. Perkins died, March 8th. Defendant was with Junior (Lesion) Perkins. [...] was not mistaken about this. Junior was driving a big truck and Defendant was with him. (T II, 157-159). The police did not [...] [...] that he saw Defendant with Junior Perkins on Monday, so it was not in his statement. (T II, 159-160). He told police that Defendant called him at 4 in the evening. He told them Defendant lived on [...]. He did not hide anything for Defendant, but gave a truthful and accurate statement. [...] did not agree with Ms. Ann Curtis Perkins. (T II, 164-167).

Officer Ronald Visbara investigated the murder with Sergeant Cathy Adams. They followed up on the [...]. Defendant [...] came up with what Raymond

Knott. They talked with Knott on March 15th, at 4:00 p.m., and obtained Defendant's name. (T II, 168-169). Defendant's mother told police that Defendant was at work. (T II, 169).

Visbara, Lieutenant Jackson and Sergeant Adams arrested Defendant at Sweet Water Tavern, and took him to Detroit Homicide. He had nothing on his person. They wanted the cell phone he used to call Mr. Knott. Defendant signed a consent to search form so police could take the phone from his house at 7:05 p.m. (T II, 170-171). Visbara claimed he never talked to Defendant. The Miranda warned Defendant when he came to him. (T II, 174-176).

Visbara made no written reports regarding his activities in the investigation. When the officers talked to Defendant at the restaurant, they did not tell him they were looking for the phone. (T II, 177-180). They waited until they got to Homicide to ask about it. Defendant said he had it, and signed the consent form. If officers knew the exact location, Sergeant Adams or Lieutenant Jackson would have told them, because Visbara did not know it. The consent form listed the cell phone only. (T II, 181-182).

Visbara talked to his Pauline neighbors, and asked for Mr. Murphy. The police spoke to her again on March 12th, 1995, at 11:00 a.m. (T II, 184).

Lieutenant Hill, Jackson also worked on this Tuesday case. (T III, 21-23). After Sergeant Adams spoke to Knott, Jackson and Visbara went to Murphy's street to interview Defendant, but was not there, so they went to Sweet Water Tavern. (T III, 9-11). After Visbara got the consent to search from Defendant for the cell phone, he and Adams went to Defendant's house, and found the phone in an upstairs bathroom. The neighbors, Jackson verified that it was the Murphy's phone. (T III, 12-13, 15-19). They also recovered a photograph. They asked Knott to speak to Defendant so they could go home. (T III, 15-19).

Jackson did not make any investigative notes. He became involved in the case when

Rhett came in. (T III, 22-23). Defendant was not drugged or "crazed" at work. The police did not mention the cell phone at Sweet Water Tavern, they only told him they were there about Ms. Perkins's murder. He was taken to Homicide before anyone mentioned the cell phone. Then Vishara came with the consent form. (T III, 24-25).

Jackson claimed that Defendant did not tell the officers that the phone would be under the mattress. Adams did not say the phone would be there either. Jackson said he, not Officer Swope, physically lifted the mattress. Jackson said he did not tell Swope where the phone was because Defendant had not told him where it was. (T III, 26-28).

Jackson admitted that Barbara Simon was "renowned" for getting statements from suspects in homicide. (T III, 29-30). Jackson described the "interview" room as 7 by 7 feet, with no windows, bare walls, a table, 3 chairs, one ceiling light, and a hole in the door. He denied talking to Defendant. (T III, 30-31).

Jackson testified that he has seen people do things when they were on crack cocaine that they might not normally do. (T III, 32).

Sergeant Cathy Adams, the officer in charge, said Vishara took Ms. Dennis's statement because she also lived in the Perkins's home, and was a suspect in the murder. Adams later checked Dennis's clothing for blood on March 12th, 2 days after the killing, because Ms. Dennis said she was wearing the same red blouse or shirt than she had on the day of the killing, and found nothing. (T III, 39-42, 59). Adams believed the clothes were the ones Dennis had on that if Ms. Dennis told her, she could not recall if the neighbors confirmed this. (T III, 59). Nothing was found in Ms. Dennis's room. They followed up on what Ms. Dennis said, and ruled her out as a suspect. (T III, 41).

After obtaining the cell phone number from Ms. Perkins, Adams contacted the phone company, and found the phone call to a residence. She interviewed Raynette Rhett at which she, and Rhett told her Defendant called her at 4:00 a.m. (T III,

44-46, 55).

Adams then went with Wisbara and Jackson to Defendant's residence, and spoke to Defendant's mother about Mrs. Perkins's death. The officers then picked up defendant at Sweet Water Tavern, and took him to police headquarters, where he was under arrest. At the Tavern, they told defendant the matter involved Mrs. Perkins, but never mentioned the cell phone. At Headquarters, Wisbara got the Consent form from defendant. (T III, 49-50, 56-57).

After the search, the officers returned with the cell phone and shotgun. They confirmed that the phone was Mrs. Perkins's. (T III, 51). They asked Simon to interview defendant and gave him the file. Later, Simon called Adams and said defendant confessed and told him he put the knife in the sink. Because the knife was found there, Adams concluded defendant would only know this if he did the crime. (T III, 52).

All the other investigators knew about the knife in the sink before March 15th. Photographs were taken before March 15th that were in the file, but Adams claimed that they would not have been in Simon's file. (T III, 53-55).

The day of the killing Officer Fleming interviewed Mr. Dennis's grandmother, Virgil Ross, at 7:30 p.m. (T III, 67, 70-71). Ross said that Mr. Dennis came to her house that day at about 1:30 p.m. with some sandwiches, then went out the back door after a few minutes. (T III, 68, 69). She had not seen Mr. Dennis since. When police spoke to Mr. Dennis on March 16th, she told Wisbara that on March 15th, she was with her grandchild who usually comes to get a bill, or another piece of paper, from her, and to Secretary of State to renew her license plate tabs. Her grandson had not called the clerk for Mr. Dennis. Mrs. Perkins explained that she was no longer living with Mrs. Perkins because Mr. Perkins's son moved in and they needed the room. She said working toward rehabilitation and ready soon to leave. (T III, 57-58, 59, 66-67, 70-71).

14

Ms. Dennis's 71 year old grandmother said on March 10th, that she had only seen Ms. Dennis for about 2 or 3 minutes. (T III, 55). To check Ms. Dennis March 12th, story, police re-interviewed her grandmother. This time, the grandmother changed her original story, and said that Ms. Dennis had been with her doing chores. (T III, 56-63, 70, 73-75). However, she did not name the chores in the same order that Ms. Dennis did. (T III, 73-75). Adams said that this raised a lot of question marks, but the police did not inquire. For example, the grandmother paid rent, but did not know where Ms. Dennis live. The officers did not go to the bank to see what checks the grandmother wrote that day, to the landlord to see if she paid her rent, or to the utility company to see if she paid a bill. Adams thought they got her to LIED and she did not renew her tabs that day, but she did not tell if the time was in file. She said she could provide ... (T III, 63-68, 73-75).

Adams said it was possible that Ms. Dennis told her grandmother what to say, 7 days after the killing, because the grandmother had been questioned March 10th and she had rejected having contact with Ms. Dennis. (T III, 76-78).

Police found no stuff in Ms. Dennis's car or her person on March 12th, 7 days after the killing, so police let her go. (T III, 73-75).

Fiona George Bank's police report showed that on March 10th police told Ms. Dennis not to leave town, but she had, contrary to their direction. For this reason, they seized Ms. Dennis car. ( III, 79, 80). Back tot noth blood ... was inside the car of the killing, but did not say that she worked ... at either. (T III, 79, 81).

Finally there was the jury in ... nothing was discovered from the prime the ... the blood from the window. (T III, 78-75). The prosecution rested. (T III, 81).

Myrtis Smith testified for the defense. She knew Ms. Dennis, but did not know Defendant. (T III, 82-85). In ..., Ms. Dennis lived in Highland

street. Snell knew of Perkins's death because she was at her sister, Dorotha Adams's, house on Hartford the day it was discovered. Ms. Dennis was at the house at about 4:00 p.m.. She was wearing a black jacket, a pink flowered pajama top under the jacket, blue jeans and black boots, not a red blouse. Snell was sure about what Ms. Dennis was wearing. (T III, 84-86).

Snell saw a mark on Ms. Dennis's left boot that looked like blood that afternoon. She told police about it. Ms. Dennis said nothing about the blood on her boot. Ms. Dennis was walking back and forth, through her house and looking out the door like everyone else as. Then, she left on foot. Snell did not know where Ms. Dennis went but said her car was in front of the house. (T III, 85-86).

On cross-examination, Snell said she was a good friend of Dennis's and that she had recently seen her in the neighborhood. (T III, 87). The boot, she said, had a rust colored mark on it that she took for blood. It looked like dried blood, and was not the color of fresh blood. Snell said she now had a doubt about whether it was blood because police took Dennis into custody. (T III, 87-88). Ms. Dennis pulled up in the car that day, and then Joe Williams, Virgil Perkins' brother, walked up. Ms. Dennis drove around the block, then parked at the house and talked with everyone. (T III, 88-90).

Snell thought the police were there when Ms. Dennis dropped Williams off and parked, and the woman was already dead. (T III, 94-95, 97). Because Ms. Perkins and Dennis's grandmother, Snell thought that Ms. Dennis's grandmother would have more money. (T III, 96).

Ledora Adams never met defendant. (T III, 101-103). She found Ms. Perkins lying on the floor. Near about 1:00 or Turkey Trot, she saw Ms. Dennis. Ms. Dennis just popped in out of the blue. (T III, 103). Ms. Dennis asked what happened, left and came back in her car 10 minutes later with Joe Williams. She did not go up to the house. Ms. Dennis did not stay to come into

Ms. Perkins. (T III, 103-104, 105). Ms. Dennis saw police, and said she was dodging them because she had warrants out for her arrest. The police told her to stay there but she took off. (T III, 106-107).

Defendant's grandmother, Forestine Calicut, testified. When the police first came to her house, her son George Calicut Jr., was at work. The police wanted to ask questions about Ms. Perkins. (T III, 110-111). When the police first came asking about her son, she called him at work to say the police were there. (T III, 111-113; T IV, 28). She did not think that he was involved, but the police kept asking if she knew her son was at the Perkins home drinking with Junior Perkins the previous Tuesday. (T IV, 16).

Mrs. Calicut recalled that the day of the killing her son was home. (T III, 113-119; T IV, 16-20). She was going to make fettucine that day. At around 10:00 a.m. her son took chicken out of the freezer. (T III, 114-115). Her son went to the basement, got his work clothes, put them on and asked her where his socks were. Later, his friend Bill picked him up at about 10 minutes before 5 to go to work. (T III, 114-117; T IV, 21). Defendant and his left the house that day until he went to work. (T III, 117; T IV, at 21).

The Calicut's house is in the family flat. Anyone leaving has to go out the front or side door. (T IV, 7, 12). Mrs. Calicut lives in Martindale with her husband, and all of her children live in their upper flat. The children are all adults who live in that family. She has a heart condition for which she takes medication. (T IV, 6-8).

Mrs. Calicut said that her son could not have slipped out of the house without her knowing about it. (T III, 118-119). She hears people on the stairs, despite her heart condition, and the television noise. (T IV, 21). If her son went to Junior Perkins's house on foot it would have taken him a half hour because he has arthritis in one hip and is lame. (T III, 118).

When police came and took her statement, they did not ask her whether her son was home the day of the killing or not, and did not tell her he was a suspect. (T III, 120). When the police first arrived, a female officer said she was looking for a cellular phone (T IV, 4-5). The 3 officers who came, a white woman, a taller black officer and an older white officer, asked her if she knew that her son was at Ms. Perkins's house drinking with Junior Perkins the previous Tuesday. (T IV, 24-25, 27).

Mrs. Calicut said her son had never been arrested, never been in a police station, and never committed any act of violence that she knew of. (T IV, 4-5). He was a saute chef who lived at home, and rented his flat from his parents. (T IV, 22-23). He was not a violent person. (T IV, 23).

Mrs. Calicut knew that her son used crack cocaine. She had never seen him on crack, so she did not know how he acted then. (T IV, 22-23). He did not live at home because of crack, all 4 of her children lived at home. The crack bothered her, as he spent alot of money on it. (T IV, 45).

She was upset and surprised that her son had a phone under his bed. Mrs. Calicut found out he had been arrested the day after police came. (T IV, 32-33). On March 17th, after she was told Defendant confessed to murder, she apologized to Wanda Mosby, Ms. Perkins daughter, who was related to Ms. Calicut by marriage. (T IV, 48, 50, 51). It was later that she recalled her son was with her at the day of the murder. (T IV, 49, 54, 55).

When Ms. Jackson came to search, she said that her son told police where the phone was located. After searching her house very thoroughly, the police left after they found a gun and the phone. (T III, 112; T IV, 34-35). When Ms. Calicut found out that her son was charged with murder, she did not call the police to say that he was home the day Ms. Perkins was killed. She called the family lawyer instead. (T IV, 36-37).

Defendant testified in his own defense, and denied committing the crime or giving the statement that Simon claimed he gave. On March 10th, he was living at home. He knew Mrs. Perkins as the mother of Wanda, Cindy, Junior and Scottie. He was related to her through marriage, and he had known her all his life. He grew up with both of her sons and was closer to Scott than he was to Junior. (T IV, 57).

Defendant had been a cook at Sweet Water Tavern for 6 months. He worked every day, had never been arrested or charged with any crime, and had never been interrogated by police before. (T IV, 58).

On March 16th, his mother called him at work and told him the police had come to their house. He told his mother that the police were at his work now. (T IV, 58-59). Sergeant Adams, Lt. Jackson and Sergeant Visbara came to the tavern. They said they wanted to talk to him about the cell phone. (T IV, 59-61). He told them he had a cell phone, did not know who it belonged to, but that he got it from Lemuel Perkins dive truck. Then they asked him to come with them and give a statement. They never said he was under arrest, so he went with them. (T IV, 62). Defendant believed he was going to talk to them about the cell phone. The police said they would bring him back to work. (T IV, 61-62).

At Headquarters, they first took defendant to a big conference room. (T IV, 62-63). Jackson asked defendant to sign the consent to search, not Visbara. (T IV, 62-14). Defendant signed the form, and then they put him in "the box", or the ... interrogation room that had only a table and a couple of chairs. Visbara ...... him in the box, asking him where the phone was from, whether he knew Lemuel Perkins, Jr. had ... he did drugs, whether he and Lemuel Perkins Jr. did drugs together. (T IV, ?-63). He did not read him his rights, and did not charge him with anything. (T IV, 64-65).

Visbara looked him in the box and left. Lieutenant Jackson then came in, told him ..... about the phone, and then asked the same questions that Visbara asked ...

about Lemuel Perkins Sr., and where he got the phone. (T IV, 66). When Jackson first came in he halted, put his weapon outside the door, and let them back in. (T IV, 67).

Then, Jackson left the box and locked it. Adams came and asked the same questions about Lemuel Perkins Jr., about the deceased, whether he knew anyone who would want to kill her. Adams left, and Viabara came back for a second visit. He asked the same questions and tried to see if Defendant was telling a lie. (T IV, 68-69). He left and Jackson came for his second visit, asked the same questions, then left and locked him in the box. After that, no one came for a while. (T IV, 69).

When Simon came, she did not read him his rights nor did she say he was charged with anything. (T IV, 70-71). Instead, she gave him the rights paper, asked if he could read, and indicated that if he understood the right, he should check each one off. When he asked if he was being charged, she said he was not charged, and that this was just procedure. (T IV, 70-71).

After he initialed his rights, he gave the paper back to her, and she signed it. She asked the same questions the others asked. For example, she asked him if he did drugs, how much drugs he had done when Ms. Perkins was killed, what time he wakes up in the morning. (T IV, 70).

At no time did Defendant say that he killed Ms. Perkins. (T IV, 71). Defendant told the jury, that Simon had lied to them. Even though it was true he had the phone under his mattress, he did not know where Lemuel Perkins Sr. got it. (T IV, 115). He admitted he had been dishonest when he told them that phone was a rental, but said he was telling the truth to the jury that he did not kill Mrs. Perkins. (T IV, 115-117).

Simon asked Defendant if he did, what first degree murder was. He said no, and she told him that next actions being a person could be charged with the

said he would not get a bond if charged with it. He would spend the remainder of his life in prison until his death if charged with it. (T IV, 70). She then said if he would sign the statement she had, he could be charged with manslaughter, get a bond, and qualify for zero to 10 years in prison. She said, you don't want to go to jail, you have never been there, and defendant was saying no, he did not. Simon said it was in his best interest to sign, and he asked her why. She explained he should sign it if he did not want to go to jail, and if he did not sign, he would not get a bond and would have to stay there. Simon said she could write him a manslaughter statement. Defendant said okay, and she wrote the statement. (T IV, 72-75, 111-113).

Simon explained the situation to Defendant not as if it was a promise, but as though it was the law, so it would be inevitable. (T IV, 113). He wanted the get the bond to go home, and he expected to be found not guilty. (T IV, 113-114, 116-117). He was not willing to go to prison for the rest of his life for a crime he did not commit. (T IV, 114-115).

Defendant looked at the rights form and the statement, and told the jury that he signed it, but that it was not true because Mrs. Perkins house was taken over, to borrow money. He had been paid the day before March 16th. He did not say he smoked crack all night, or that he asked out for money and that "lost it." He did not tell Simon he choked the Perkins until she passed out, would not make it, that he cut the skin to make it look like a breaking and entering. (T IV, 72-75). But did he tell Simon he took $5.00 from Mrs. Perkins' purse, or that he cashed an eight dollar bill and bought cocaine that evening. (T IV, 75).

Defendant told the jury he wanted to sign the statement that written him manslaughter, that he would go home, and then call his lawyer, so he signed it. (T IV, 76-77). Simon told defendant if he called an attorney from police headquarters, he would be charged with first degree murder because she would...

the case over to the investigating officers. She said that this was because he had the cell phone. (T IV, 77). Simon told defendant, he was not charged with anything, but that the other officers wanted to convict him of first degree murder. (T IV, 120). On the first page of the statement he had stopped writing his name because he was not sure about signing, then completed writing it after asking Simon again about what it meant. Simon said defendant needed to sign it. (T IV, 122). Defendant was in homicide, and he trusted Simon more than the other officers. (T IV, 123).

Defendant believed Simon when she said he might get a plea for manslaughter, since he knew people who had gotten less time for worst conduct. (T IV, 108). Defendant said he truely thought if he signed every page he would be charged with manslaughter but become eligible for a bond, then he could explain to georgia why he signed the statement. (T IV, 110-111).

Defendant reiterated that he did not kill Mrs. Perkins, he was not in need of money and he had no reason to do that. He got the phone from Lemuel Perkins Jr., who was in town on Monday, the 8th of March, and a number of people saw them together, including Mrs. Perkins. (T IV, 77-78, 81).

He stole the phone from Lemuel Perkins's truck the day after the murder, on Thursday, March 11th. (T IV, 81, 92, 96). Defendant said he stole the phone, even though he had his own money, and he could not make excuses for it. (T IV, 105-117). He waited at least 3 days before calling anyone on the phone, then he called Raymond Knott at 4:00 a.m., and knew he would Raymond up. (T IV, 97). He was not high when he called Knott, nor had he lost track of time. (T IV, 98, 104). Defendant admitted that he could have got the phone other places but he hid it under a mattress. (T IV, 100-101).

On cross-examination defendant testified that he had known Mrs. Perkins all his life, that she would let him in her house if he wished, and that she was like

his aunt to him, someone he cared about deeply. At one time the Perkins family rented a flat from his parents. (T IV, 82-83). One of Mrs. Perkins's children, Wanda Moody, is married to Defendant's uncle. (T IV, 83).

Defendant explained that after he found out Mrs. Perkins had been killed, he did not speak with her husband. (T IV, 83). His parents told him that she was murdered, but he did not know that her throat was slashed. He thought the killing was awful, but he was not feeling guilty because he had not killed her. (T IV, 83-84). Any person who was like him would never had done a killing like that, because he is a peaceful person. (T IV, 86).

Defendant admitted that he smokes crack cocaine, but said that he is peaceful when he does it. (T IV, 86). He did not get off work on Wednesday, March 10th until about 3:15 a.m. He went to a crack house for a few minutes, smoked the crack at home in his upstairs flat, and went to bed. (T IV, 87-89). Defendant said his mother knew he used crack, and it bothered her, but he was not out of control with it, even though he spent a lot of money on it. He did not smoke enough to hinder his work in any way, or to change his attitude towards people, and crack did not dictate his every day life. (T IV, 90). He did rob from or at crack houses. (T IV, 105, 106).

Defendant did not go to Mrs. Perkins's funeral, even though she was like an aunt. He tried to explain that not going to the funeral did not make him guilty of her murder. (T IV, 96-100).

Defendant said he knew Mrs. Perkins would have allowed him in her house, but said that he would never ask her for money, had never asked her for money, because if he wanted to borrow money, he could have done that at home. (T IV, 101-106). Defendant said that he was innocent. (T IV, 110).

The defense rested. (T IV, 120). Closing arguments followed by the prosecution (T IV, 122-135), and then the defense (T IV, 135-167), and thereafter the

prosecutor rebutted (T IV, 165-179). The jury was then instructed. (T V, 3-20), and after deliberating returned a verdict of guilty as to felony murder. (T V, 21). Defendant was subsequently sentenced on October 27th, 1999, to mandatory life in prison. (ST, 13).

Defendant filed a timely Claim of Appeal on January 25th, 2000, and and the this Court pursuant to the indigent request for appointment of appellate counsel issued an order appointing the State Appellate Defender Office as authorized by MCR 6.425(F)(3). The State Appellate Defender Office assigned Derek M. Hunter (P35961), who filed a Brief on Appeal on Michigan Court of Appeals Docket No. 224817, raising the following issues:

I.      THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. CALICUT'S CONVICTION FOR FIRST-DEGREE FELONY MURDER IN VIOLATION OF MICHIGAN CONST 1963, ART 1 § 17 AND US CONST, AMS V AND XIV.

II.     MR. CALICUT'S RIGHT TO DUE PROCESS, HIS RIGHT AGAINST SELF-INCRIMINATION AND HIS RIGHT TO COUNSEL VIOLATED WHERE POLICE FAILED TO MAKE AN AUDIO OR VIDEO RECORDING OF HIS STATEMENT.

III.    MR. CALICUT'S TRIAL COUNSEL WAS INEFFECTIVE UNDER US CONST, AMS VI, XIV AND MICH CONST 1963 ART 1, §§ 17, 20 WHERE HE FAILED TO MOVE FOR SUPPRESSION OF MR. CALICUT'S CONSENT TO SEARCH AND HIS STATEMENT AS BEING THE FRUITS OF AN ILLEGAL ARREST AND FAILED TO SEEK THEIR SUPPRESSION BECAUSE THEY WAS NOT VOLUNTARILY MADE.

A.      Trial Counsel Was Ineffective For Failing To Move To Suppress Mr. Calicut's Consent To Search Or His Confession Which Both Were The Fruit Of An Illegal Arrest That Was Not Based On Probable Cause But Rather Was Made To Investigate Crime.

B.      Trial Counsel Rendered Ineffective Assistance When He Failed To Challenge The Admissibility Of The Confession On The Ground That It Was Involuntary And Unreliable Under All The Circumstances.

Appellate counsel also simultaneously filed a Motion To Remand For A Evidentiary Hearing under People v. Ginther, 390 Mich 436 (1973), to establish

with his claim on ineffective assistance of counsel.

During the pendency of the appeal of right, appellate counsel was internally substituted from Sarah E. Hunter, to Jacqueline J. McCann.

On November 6th, 2000, the Michigan Court of Appeal issued it's Order Denying Defendant's Motion To Remand (See Appendix-A), and thereafter, on December 7th, 2001, the Michigan Court of Appeals issued their Per Curiam Opinion and Order affirming Defendant's conviction (See Appendix-B).

Defendant then raised the same issues raised in the Michigan Court of Appeals in the Michigan Supreme Court, through appellate counsel Jacqueline J. McCann, of the State Appellate Defender's Office by filing a Delayed Application for Leave To Appeal, which was assigned Case No. 120916, and on July 29th, 2002, the Michigan Supreme Court considered and denied leave to appeal (See Appendix-C).

Defendant then raised the following issues in a Motion For Relief From Judgment:

I. THE COURT ERRED REVERSIBLY IN FAILING TO SUA SPONTE INSTRUCT THAT THE KILLING AND THE LARCENY WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THIS INSTRUCTION.

II. DEFENDANT'S CONVICTION MUST BE REDUCED TO SECOND DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED LARCENY OCCURRED FROM A DEAD BODY.

III. DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B) EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL.

IV. THE POLICE LACKED PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE OBTAINED THEREFROM WAS UNLAWFULLY ADMITTED AGAINST HIM.

V. DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION IN THE FOLLOWING WAYS:

VI. DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL DURING HIS CONSTITUTIONALLY PROTECTED STATE APPEAL OF RIGHT IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

VII. DEFENDANT HAS SHOWN "GOOD CAUSE" AND "ACTUAL PREJUDICE" AND IS ENTITLED TO HAVE THIS COURT REACH THE MERITS OF THESE CLAIMS.

On January 16th, 2004, the Honorable Craig Strong of the Third Circuit Court, Criminal Division issued an Opinion and Order Denying Relief (See Appendix-F). Defendant now submits his Application For Leave To Appeal raising the same issues.

**I.**     THE COURT ERRED REVERSIBLY IN FAILING TO <u>SUA SPONTE</u> INSTRUCT THAT THE KILLING AND LARCENY WERE UNRELATED, OR ALTERNATIVELY COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THIS INSTRUCTION.

A properly instructed jury is a fundamental part of the right to a jury trial and is guaranteed by Due Process. US Const, Amends V, VI, XIV; Mich Const 1963, Art 1, §§ 17, 20. <u>Beck</u> v. <u>Alabama</u>, 447 US 625; 100 S Ct 2382; 65 L Ed 2d 392 (1980); <u>Vujosevic</u> v. <u>Rafferty</u>, 844 F.2d 1023, 1027 (CA 1, 1988).

Even in the absence of request or objection, the trial court has an obligation to fully and fairly present the defense case to the jury in an understandable manner. <u>People</u> v. <u>Mrs Jones</u>, 395 Mich. 379 (1975). Instructions must adequately present the defenses to the jury under the testimony developed at trial even in the absence of objection. <u>People</u> v. <u>Townes</u>, 391 Mich. 578 (1974); <u>People</u> v. <u>Reed</u>, 393 Mich. 342, 349-350 (1975); also see 22 Michigan Law and Practice, Trial, §238, p. 306.

According to the evidence presented by the prosecution the victim was already dead from strangulation and a knife wound to the throat when the cellular phone and $5.00 were allegedly taken. The prosecution's questions assumed that the victim was dead. The prosecutor thus failed to prove that the victim was still alive, so the cellular phone and the $5.00 was not the property of a living person against whose consent it could be taken. Sergeant Flynn insisted that Defendant told him that he took the cell phone and $5.00 to make it look like somebody broke into the house. (T II, 6-7, 171). Remarkably, even the victim's husband testified that other than the cell phone, nothing was missing, as his guns, fishing equipment, stereo and television were not taken (T I, 145-146).

There is no standard of review because this Court has held no ruling here. This was plain error which "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." <u>United States</u> v. <u>Young</u>, 470

25

US 1, 13 (1965); People v. Hamborsten, 441 Mich 148, 545 (1..33).

In United States v. Bolden, 514 F.2d 1301, 1307-1309 (DC DC, 1975), the court explained:

> While the statute defining the crime, and the court's instructions in this case, require for conviction simply that one "will another in perpetrating or in attempting to perpetrate any robbery," we have held that mere coincidence in time between the murder and the robbery is insufficient to support a felony-murder conviction. United States v. Heinlein, 160 US App DC 157, 490 F.2d 725, 736 (1973). "[T]he statute embraces occasions when the jury may properly be urged to find that the homicidal act fell outside the scope of the felonious crime which the parties undertook to commit." Ibid. at 737. A jury may therefore acquit where it finds that the robbery was merely an afterthought following the homicide. United States v. Mack, 151 US App DC 162, 466 F.2d 333, 339, cert denied, 409 US 951, 93 S Ct 297; 34 L Ed 2d 223 (1972).
>
> In response to the jury's questions, the trial court should have informed the jury (1) that to convict on felony murder it was necessary that the intent to rob be formed before the homicide, see United States v. Mack, supra, 466 F.2d at 338-339; (2) that "intent" can only be proved by action beyond mere preparation, since until that time defendants could have abandoned the plan without legal liability, see Hanford v. United States, 75 US App DC 107, 130 F.2d 411, 413, cert. denied, 317 US 656; 63 S Ct 52; 87 L Ed 527 (1942); and (3) that even if the jury found a robbery did occur, that finding by itself did not settle the issue whether the intent to rob was formed before or after the homicide. (Emphasis added; footnotes omitted).

See also People v. Rice, 61 AD2d 758, 402 NYS2d 151 (1978).

Recently, on July 11th, 2002, the Michigan Supreme Court issued it's opinion and order in a published case entitled People v. Randolph, 466 Mich 532 (2002), whereby the Court overruled the Michigan Court of Appeals, 80 p.a. court of expansion of the codified common-law requirements of robbery through adoption of the "transactional approach," as that Court stated:

> "In summary, at common law, a robbery required that the force, violence, or putting in fear occur before or contemporaneous with the larcenous taking. If the violence, force, or putting in fear occurred after

26

the taking, the crime was not robbery, but rather
larceny and perhaps assualt. Hence, the transactional
approach" espoused by the Court of Appeals is without
pedigree in our law and must be abandoned. Sanders,
LeFlore, Turner, and Tinsly are overruled. 466 Mich
at 546.

The court erred reversibly in failing to _sua_ _sponte_ instruct that if the
killing and larceny were unrelated then Defendant was not guilty of felony
murder. This was a critical defense that was never explained to the
jury. Defendant is entitled to a new trial.

Alternatively counsel was ineffective in failing to request this instruction
or argue this theory. People v. Bennie Thomas, 406 Mich 971 (1979)(Levin
J.)(dissenting to denial of leave), Justice Levin argued that counsel was
ineffective, in a case similiar to the instant case, for failing to argue that the
theft and murders were unrelated -- that the intent to steal was formulated after
the killings. In that case there was evidence of a robbery, and a love triangle.

In the instant case there was evidence of a larceny after a killing. Counsel
should have either argued alternatively that the theft was an afterthought,
according to the prosecution's evidence, or at least requested a clarifying
instruction on this point. Counsel failed Defendant a viable defense and so was
ineffective.

**II.**    **DEFENDANT'S CONVICTION MUST BE REDUCED TO SECOND DEGREE MURDER WHERE THE SUBSEQUENT ALLEGED LARCENY OCCURRED FROM A DEAD BODY.**

Defendant was charged with felony murder in the perpetration of a larceny. The Court instructed on misdemeanor larceny, requiring the finding of five elements: (1) that the Defendant took someone else's property, (2) **that the property was taken without consent**, (3) that there was some movement of the property, (4) that there was an intent to permanently deprive the owner of the property, and (5) that the property was worth something when taken. (T IV, 11; CJI2d 23.1).

The elements of larceny require that the defendant take the property of some person without consent. But here, according to the evidence presented by the prosecution the victim was already dead from strangulation and a knife wound to the throat when the cellular phone and $5.00 were allegedly taken. The prosecution's questions assumed that the victim was dead. The prosecutor thus failed to prove that the victim was still alive. So the cellular phone and the $5.00 was not the property of a living person against whom consent it could be taken. Sergeant Simon insisted that Defendant told him that he took the cell phone and $5.00 to make it look like somebody broke into the house. (T IV, 6-7, 95). Remarkably, even the victim's husband testified that other than the phone, nothing was missing, as his guns, fishing equipment, stereo and television were not taken. (T I, 112-113).

There is no standard of review because this Court made no ruling here. This was plain error which "undermine[] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice. United States v. King, 470 US 1, 17 (1985). Th caused a manifest injustice. People v. Carines, 43 Mich 780, 774 (1997).

-- Properly instructed jury is a fundamental part of the right to a jury trial

28

and is guaranteed by Due Process. US Const, Amends V, VI, XIV; Mich Const 1963, Art 1, §§ 17, 20. Beck v. Alabama, 447 US 625; 100 S Ct 2382; 65 L Ed 2d 392 (1980); Vujsevic v. Rafferty, 844 F.2d 1023, 1027 (CA 3, 1988).

Even in the absence of request or objection, the trial court has an obligation to fully and fairly present the defense case to the jury in an understandable manner. People v. Ora Jones, 395 Mich 379 (1975). Instructions must adequately present the defense to the jury under the testimony developed at trial even in the absence of objection. People v. Thomas, 391 Mich 671 (1974); People v. Reed, 393 Mich 342, 349-350 (1975); also see 22 Michigan Law and Practice, Trial, §236, p. 388.

In People v. Hutner, 209 Mich App 280 (1995), the court similarly held that the defendant's murder and subsequent sexual penetration of the victim did not constitute felony murder. The victim was no longer alive and so was not a "person" who could be sexually assaulted and refuse consent, as in CSC 1. And sexual penetration of a dead body was not one of the enumerated felonies under the felony murder statute.

As too here the larceny required a live victim -- a person who owned the property and who could deny consent. While it might be argued that there was evidence here of a death during an attempt to perpetrate a larceny, alternatively counsel was ineffective in failing to argue and request an instruction on the theory that the death and larceny was undesired, see Issue I, supra. Counsel was also ineffective in failing to argue or request instruction on the fact that there was no live victim, a necessary element of a larceny.

### III.   DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR PRESENTED 404(B) EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL.

Defendant submits that the prior bad acts, although arguably admitted for a permissible purpose, was far more prejudicial than probative, denying defendant his due process right to a fair trial. US Const, Ams X, XIV; Mich Const 1963, Art 1, § 17.

Defendant was charged with felony murder in the perpetration of any larceny. According to the prosecution's theory and evidence presented the defendant was the person who killed Virgie Perkins because he had her cellular telephone 4 days after she was killed. Defendant admitted he used crack cocaine, and because he signed the confession that Officer Simon wrote.

Simon stated that defendant told her that he was high after smoking crack all night. He went to Mrs. Perkins house at about 10:00 a.m. to ask for money for crack. When Mrs. Perkins said she had no money, he "lost it", choking her until she passed out. After trying to wake her up, he cut her wrist to make it look like someone broke in and killed her. He put the knife in the sink, went through her purse, took $5.00 and the cellular phone and left. (T II, 8-7, 29, 30).

The prosecution asserted that the Defendant came into the police departs after the police contacted the phone company and learned that Mr. Raymond Knott had been called on the cell phone 3 days after the death of Mrs. Perkins. Police then contacted Mr. Knott who identified the caller as defendant. (T II, 1 -165; T III, 41-56).

Lieutenant Billy Jackson testified that he has seen people do things when they were on crack cocaine that they might not normally do. (T III, 30).

Defendant's mother testified that she knew her son, the defendant used crack cocaine, however, because he never used it around her, she did not know how he acted when under it's influence. (T IV, 12-13). She also stated that defendant had

not live at home because of crack as all her kids lived at home. The crack bothered her because defendant spent alot of money on it. (I IV, 45). There are many instances where drug usage was highlighted by the prosecution (I IV, 64-65, 67-68).

It is clear that highlighting Defendant's drug usage was part of the prosecutor's strategy. The prosecution wanted to hammer in to the jury that defendant was a bad person because he was a drug user, and therefore the defendant's drug use suggests that the defendant committed this crime.

The admissibility of evidence of a defendant's prior crimes or bad acts is governed by MRE 404(b) and People v. VanderVliet, 444 Mich 52; 508 NW2d 114 (1993). MRE 404(b) states:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case." Id.

Evidence of other crimes is admissible to prove a propensity to commit such acts. MRE 404(b); People v. Engleman, 434 Mich 204, 211; 453 NW2d 656 (1990) "This rule of law guards against convicting an accused person because he is a bad man." People v. Robinson, 417 Mich 661, 677 (1983). Evidence of other crimes or bad acts cluster the danger that the jury will infer the conviction from the charged crime with first, the bad the defendant has a propensity to commit such crimes.

In People v. VanderVliet, 444 Mich 52 (1993), the Michigan Supreme Court followed the both and set to employ the following standards in assessing the admissibility of evidence of other crimes; wrongs, or acts: (1) the evidence must

be offered for a purpose other than to show the defendant's propensity to commit a crime; (2) the evidence must be relevant under MR 401 to an issue or fact of consequence at trial; (3) the trial court should determine under MRE 403 whether the danger of undue prejudice substantially outweighs the probative value of the evidence, in view of the availability of other means of proof and other facts appropriate for making a decision of this kind. Id. at 74-75.

Although arguably relevant and probative, testimony about drug usage is held to be prejudicial. In People v. Williams, 63 Mich App 989 (1975), the Court reversed a conviction for larceny because evidence of the defendant's drug use was admitted. The Court found that the evidence was more prejudicial than probative. Similarly, in People v. White, 53 Mich App 65 (1972), the Court held that reference to drugs in the prosecutor's case was highly prejudicial.

In People v. James Robinson, 417 Mich 561 (1983), the Court reversed a conviction where relevant evidence of prior bad acts of the accused was introduced into evidence, because they were more prejudicial than probative. The Court, quoting from People v. DerMartzex, said that "whatever probative value such evidence has is outweighed by the disadvantage of diverting the trier of fact from an objective appraisal of the defendant's guilt or innocence." The prosecutor detailed the usage of cocaine by the defendant, and repeatedly referenced it, in his opening (T X, 81, 90, 91, 93) and closing (T IV, 125, 126, 127-128, 129, 170, 171, 173, 174) statements. Detective Jackson even went so far as to elaborate on the list of people to whom they sold crack cocaine that they virtually couldn't do. (T VII, 23). Clearly, it was not the cocaine usage which was the subject of the instant charges. The detail allowed was its abuse of the jury, was unfairly prejudicial, and performed for its prejudicial effect, and unnecessary, as it causes a show for dramatic, and prejudicial effect.

Evidence of Defendant's cocaine usage was highly prejudicial. The brief use

failed to properly employ the third prong of the VanderVliet prior acts test: the balancing process under Rule 405. Thus this Court must make a "determination . . . whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decisions of this kind under Rule 403." VanderVliet, 444 Mich at 75. Here the probative value of the prior acts evidence was far outweighed by the prejudicial effect. It is "simply incredible" to believe that the jury could have discounted this evidence when judging Defendant's guilt or innocence. The continual reference to the drug usage and its dramatization before the jury reinforced what the prosecutor hoped it would, that Defendant who was a "crack head" which are people that do things that they normally wouldn't do, committed the instant offense. Thus the prosecutors actions made the trial fundamentally unfair and therefore denied the process. People v. Jones, 48 Mich App 334 (1974); People v. Morgan, 86 Mich App 318 (1978), People v. McKinney, 410 Mich 413 (1981). Defendant is entitled to a new trial.

IV.    THE POLICE LACKED PROBABLE CAUSE FOR DEFENDANT'S
       WARRANTLESS ARREST, CONSEQUENTLY, ANY EVIDENCE
       OBTAINED THEREFROM WAS UNLAWFULLY ADMITTED AGAINST
       HIM.

The Fourth Amendment of the United States Constitution commands that no warrants for searches or arrests shall be issued except "upon probable cause . . ." US Const, Ams VI, XIV; Mich Const 1963, Art I, § 11.

Defendant was arrested when the police arrived at the Sweet Water Tavern. Officer Wisbare said that he, Officer Cockson, and Officer Adams arrested Defendant at the tavern and took him to Detroit Homicide after obtaining Defendant's name as the caller on Ms. Perkins's (the deceased) phone to Raymond Mott. (T II, 166-169, 170-71, 174-176). They did so because they wanted the cell phone, and it was after defendant was arrested that defendant was asked to sign the consent to search form, so the police could investigate whether the phone was at Defendant's house. (T II, 170-171). Defendant was then turned over to Detective Simon, who said defendant was in custody in the interrogation room when she obtained a confession from him. (T I, 165-166; T II, 23). According to Wisbare, defendant was not even told the police wanted the cell phone when he was arrested at the Sweet Water Tavern, ostensibly for questioning. (T II, 176-180). It is clear then, Wisbare's testimony that defendant was arrested for investigation, given that police did not even intend to investigate whether he might own the phones until they took him into custody. Indeed, he signed the consent form after he was arrested.

If not, with Wisbare's own testimony, Officer Wisbare testified that police did not mention the cell phone at Sweet Water Tavern, as they only said they were there about the murder of Ms. Perkins. It was not until defendant was taken to Homicide that police asked him for the consent to search and mentioned the phone. (T III, 18-20). Sergeant Craig Simon said that the officers picked up